## The MARIANNA FLORA. The Vice Consul of Portugal, *Claimant.*

In Admiralty proceedings, amendments are made in the appellate Court, not only as to form, but as to matter of substance, as by the filing a new count to the libel; the parties being permitted, whenever public justice, and the substantial merits require it, to introduce new allegations and new proofs; *non allegata allegare, et non probata probare.*

If the amendment is made in the Circuit Court, the cause is heard and adjudicated by that Court, and (upon appeal) by this Court on the new allegation; but if the amendment is allowed by this Court, the cause is remanded to the Circuit Court, with directions to permit the amendment to be made.

An attack made upon a vessel of the United States, by an armed vessel, with the avowed intention of repelling the approach of the former, or of crippling or destroying her, upon a mistaken supposition that she was a piratical cruizer, and without a piratical or felonious intent, or for the purpose of wanton plunder, or malicious destruction of property, is not a *piratical aggression* under the act of the 3d of March, 1819, c. 75.

Nor is an armed vessel, captured under such circumstances, liable to confiscation as for a hostile aggression, under the general law of nations.

VOL. XI.

The act extends to *foreign* vessels committing a piratical aggression ; and whatever responsibility the nation may incur towards foreign states, by executing its provisions, the tribunals of the United States are bound to carry them into effect.

Pirates may be lawfully captured by the public or private ships of any nation, in peace or in war ; for they are *hostes humani generis.*

American ships offending against our own laws, may be seized upon the ocean, and foreign ships thus offending within our territorial jurisdiction, may be pursued and seized upon the ocean, and brought into our ports for adjudication.

But, in such cases, the party seizes at his peril, and is liable to costs and damages if he fails to establish the forfeiture.

Ships of war sailing under the authority of their government, in time of peace, have a right to approach other vessels at sea for the purpose of ascertaining their real characters, so far as the same can be done without the exercise of the right of visitation and search, which does not exist in time of peace.

No vessel is bound to await the approach of armed ships under such circumstances ; but such vessel cannot lawfully prevent their approach by the use of force, upon the mere suspicion of danger.

Where an aggression was committed by a foreign armed merchant vessel, on a public armed ship of the United States, under these circumstances, and a combat ensued upon mutual misapprehension and mistake, the commander of the public ship was held exempt from costs and damages for subduing, seizing, and bringing into a port of this country for adjudication, the offending vessel.

APPEAL from the Circuit Court of Massachusetts.

The original libel filed in the District Court against the Portuguese ship Marianna Flora, and cargo, was for an alleged piratical aggression attempted or committed by the ship on the United States' armed schooner Alligator, Lieutenant Stockton commander, against the act of Congress of the 3d of March, 1819, c. 75. entitled, " An act to protect the commerce of the United States, and punish the crime of piracy."[a]

    *a* Which provides, (sec. 1.) that the President of the United States be authorized and requested to employ so many of the public

Upon the hearing of the cause in the District Court, the Judge pronounced an interlocutory sentence of restitution, and subsequently pronounced a further decree for damages, amounting to 19,675 dollars, for the act of sending in the ship for adjudication, and the consequent detention. An appeal was taken by the libellants from both decrees to the Circuit Court; and, afterwards, before the hearing of the appeal, by request of the government of the United States, and with the consent of the libellants, the ship and cargo were restored to the claimants, and fur-

armed vessels as in his judgment the service may require, with suitable instructions to the commanders thereof, in protecting the merchant vessels of the United States, and their crews, from piratical aggressions and depredations. (Sec. 2.) The President of the United States is authorized to instruct the commanders of the public armed vessels of the United States, to subdue, seize, take, and send into any port of the United States, any armed vessel or boat, or any vessel or boat, the crew whereof shall be armed, and which shall have attempted or committed any piratical aggression, search, restraint, depredation, or seizure, upon any vessel of the United States, or of the citizens thereof, or upon any other vessel; and also to retake any vessel of the United States, or its citizens, which may have been unlawfully captured upon the high seas. (Sec. 3.) Authorizes the merchant vessels of the United States to defend themselves against any piratical aggressions, &c. and to capture the assailant. (Sec. 4.) Whenever any vessel or boat, from which any piratical aggression, search, restraint, depredation, or seizure, shall have been first attempted or made, shall be captured and brought into any port of the United States, the same shall and may be adjudged and condemned to their use, and that of the captors, after due process and trial, in any Court having admiralty jurisdiction, and which shall be holden for the district into which such captured vessel shall be brought; and the same Court shall thereupon order a sale and distribution thereof accordingly, and at their discretion.

ther proceedings respecting the same were abandoned. The only question, therefore, litigated in the Circuit Court, was upon the point of damages, and, ultimately, a decree was there pronounced reversing the decree for damages; and this constituted the matter of the present appeal.

Pending the proceedings in the Circuit Court, leave was granted to the libellants to file a new count or allegation, in which the aggression was stated to be hostile, and with intent to sink and destroy the Alligator, and in violation of the law of nations.

The facts which were given in evidence, and relied on to support the allegations in the libel, were substantially as follows : On the morning of the 5th of November, 1821, the Alligator and the Marianna Flora, were mutually descried by each other on the ocean, at the distance of about nine miles, the Alligator being on a cruize against pirates and slave traders, under the instructions of the President, and the Portuguese vessel being bound on a voyage from Bahia to Lisbon, with a valuable cargo on board. The two vessels were then steering on courses nearly at right angles with each other, the Marianna Flora being under the lee bow of the Alligator. A squall soon afterwards came on, which occasioned an obscuration for some time. Upon the clearing up of the weather, it appeared that the Marianna Flora had crossed the point of intersection of the courses of the two vessels, and was about four miles distant on the weather bow of the Alligator. Soon afterwards she shortened sail and

hove to, having at this time a vane or flag on her
mast, somewhat below the head, which, together
with her other manœuvres, induced Lieutenant
Stockton to suppose she was in distress, or wish-
ed for information. Accordingly, he deemed it
his duty, upon this apparent invitation, to ap-
proach her, and immediately changed his course
towards her. When the Alligator was within
long shot of the Portuguese ship, the latter fired
a cannon shot ahead of the Alligator, and exhi-
bited the appearance and equipments of an
armed vessel. Lieutenant Stockton immediately
hoisted the United States' flag and pendant.
The Marianna Flora then fired two more guns,
one loaded with grape, which fell short, the other
loaded with round shot, which passed over and
beyond the Alligator. This conduct induced
Lieutenant Stockton to believe the ship to be a
piratical or a slave vessel, and he directed his
own guns to be fired in return; but as they were
only carronades, they did not reach her. The
Alligator continued to approach, and the Mari-
anna Flora continued firing at her at times, until
she came within musket shot, and then a broad-
side from the Alligator produced such intimida-
tion that the Portuguese ship almost immediately
ceased firing. At that time, and not before, the
Portuguese ship hoisted her national flag. Lieu-
tenant Stockton ordered the ship to surrender,
and send her boat on board, which was accord-
ingly done. He demanded an explanation; and
the statement made to him by the Portuguese
master, and other officers, was, that they did not

1826.

The Marian-
na Flora.

know him to be an American ship of war, but took him to be a piratical cruizer. Under these circumstances, without much examination of the papers, or the voyage of the ship, Lieutenant Stockton determined to send her into the United States, on account of this, which he deemed a piratical aggression. She was, accordingly, manned, and sent, with her officers and crew, under the orders of Lieutenant Abbot, into Boston.

*Feb. 20th.*

Mr. *J. Knapp*, for the appellants, argued, (1) upon the facts, to show that the visitation of the Marianna Flora, and her detention for examination and search, were unlawful and unjustifiable. He insisted, that the Portuguese master was deceived by the omission of the Alligator to affirm her flag with a gun, according to the law and usage of the nations on the European continent.[a] He had a lawful right to resist the approach of the other vessel, until assured, beyond all reasonable doubt, of her true national character.[b] A remark of Lord Ellenborough, in an analogous case, recognises such manœuvres as were used by the Marianna Flora, as coming within the legitimate acts of defensive resistance. He says, " defence might happen in various ways, as by making a show of confidence in the face of an enemy, with a view to deter him from an attack."[c] Upon the topics of the nature or

a 2 *Azuni*, 203.   2 *Wheat. Rep. Appendix*, 10.   1 *Code des Prises, par Le Beau*, 223.

b *Puffend.* l. 2. c. 3. sec. 8.   2 *Rutherf.* 493.   2 *Azuni*, 207.

c 6 *East's Rep.* 202.

character of unblameable defence, and the time **1826.** when forcible resistance may lawfully begin, and the extent to which it may be carried, particularly The Marianna Flora. between persons belonging to different civil societies, or between vessels of different nations, on the ocean, authorities were cited from various text writers, as applicable to the situation of the Portuguese master, and justifying his conduct.[a] It was asked, if it be lawful for private ships to arm, in time of peace, for the purposes of self-protection, whether that liberty did not comprehend the right to do with force whatever, under existing circumstances of apparent peril, human instinct and natural prudence would dictate? Could the maxim that we must so use what belongs to us as not to infringe the rights of others, be inconsistent with this principle? Could it be the duty of the master of a merchant vessel armed for such a purpose, when his nation was at peace with all the world, and when the seas were infested with pirates, to suffer another armed vessel to approach him without first being satisfied of her pacific intentions? Still less was it his duty to submit to the exercise of the right of visitation and search, (a right which has no existence in time of peace,) in the unlawful manner in which it was attempted to be exercised.

2. It was insisted, that if the search and examination had been made in a lawful and deliberate manner, it must have resulted in a conviction

a 1 *Ruther.* 372—377. 398. 180. *Puffend.* l. 2. c. 5. § 6. 8.
b 2 *Azuni*, 205. 1 *Mason's Rep.* 24. The George.

of the innocence of the Portuguese ship, and her consequent immediate liberation. As, in this case, simple reparation only was sought, and not vindictive damages, it was considered sufficient to refer to the case of the *Appollon*, where it was laid down by this Court, that, except in cases of captures *jure belli*, or on exemption expressly created by statute, even probable cause will not excuse from simple reparation.[a] But, there must, in every case, be probable cause to justify the seizure.[b]

3. But, it was further contended, that the subsequent detention and sending in of the ship for adjudication, was wholly unjustifiable, and subjected the seizor to damages. Even the harsh and unbending rules of prize law render the captors liable to costs and damages whenever the evidence of the neutrality of the ship and cargo exists on board, unless it is afterwards shown to be enemy's property, or to have been guilty of some unneutral conduct, rendering it liable to confiscation.[c] But yet there was a distinction between a right to seize and examine, and a right to capture. The right to detain and send in for adjudication, did not necessarily follow from a seizure and examination, which might have been warranted by the circumstances, but which had not resulted in showing that there was any re͟

a 9 *Wheat. Rep.* 374.

b 2 *Cranch's Rep.* 64. 170.    3 *Cranch's Rep.* 458.

c *Wheat. Capt.* 312.    *Appx. Croke. Reply to Schlegal,* 62. 2 *Azuni,* 212.    1 *Dall. Rep.* 183. 2 *Wheat. Rep.* 333.    The Anna Maria.

son to doubt the true character of the Portuguese vessel, and the innocence of her conduct. But, at all events, the misconduct of the master, supposing it to be ever so aggravated, could not affect the owners of the ship and cargo, whose agent he was, for ordinary civil purposes, but not so as to subject their property to loss or injury by his unlawful acts. And for the losses accruing by the detention of the ship and cargo in port, after it was satisfactorily ascertained that they could not be proceeded against by the seizors, there was still less reason to doubt the right of the claimants to recover damages.[a]

4. The charge that the Portuguese ship had attempted, or committed, a piratical aggression or restraint, within the act of Congress, was considered as negatived by the restitution, with the consent of the captors, in the Court below. Whatever might be the nature or degree of the offence meant to be defined by the act, it must be *piratical;* and all the authorities define piracy to be a robbery, or forcible depredation on the high seas; and they all concur, that a bare assault, without taking or pillaging something, does not constitute this crime.[b] If the act of Congress goes beyond this definition, it is not war-

1826.

The Marianna Flora.

a 2 *Bro. Civ. & Adm. Law,* 210. 5 *Rob.* 40. The St. Juan Baptista. 4 *Rob.* 58. The Zee Star. 3 *Dall. Rep.* 333. 2 *Wheat. Rep. Appx.* 12.

b 2 *Woodes.* 140. 2 *Azuni,* 351. *Bynk. Q. J. Pub.* Duponceau's *transl.* 127, note. 2 *Bro. Civ. & Adm. Law,* 462. 1 *Sir L. Jenkins' Life,* &c. 91. 5 *Wheat. Rep.* 161. 3 *Wheat. Rep.* 641.

ranted by the law of nations, and cannot give jurisdiction to the tribunals of this country over the persons and property of foreigners.

Mr. *Blake*, for the respondents, made three points :

(1.) The captors were justifiable, under all the circumstances of the case, in subduing and taking possession of the Portuguese ship.

(2.) They were justifiable in sending her in for adjudication.

(3.) There was probable cause of seizure and sending in for adjudication.

1. Even the sentence of the District Court admits that Captain Stockton was not liable to damages for the mere act of subduing and seizing the ship. She had committed a hostile and piratical aggression on a public vessel of the United States in time of peace. The learned counsel here entered into an able and elaborate argument upon the evidence, to show that the first aggression was committed by the Portuguese ship, and that it was not justified or excused by the conduct of the Alligator. It was a predetermined, deliberate, and wanton attack ; not an accidental rencounter, nor the result of any mistake. It was an act of private war, and the *onus probandi* is on the claimant to show that it was authorized by the law of nations. Admitting even that the Alligator pursued the Portuguese vessel, she had an unquestionable right to approach her in time of peace ; and an attempt to exercise the right could not be construed into

an act of hostility, or warrant the use of force to prevent it. As the ocean is the common property of all nations, every nation has a right to its free use, and no one can claim the exclusive control of a larger portion than is sufficient for the purposes of its own movements. The regulations as to keeping out of cannon shot, and sending a boat on board, are applicable only to a state of war, and to the exercise of the belligerent right of search, which, it is admitted, does not exist in time of peace. Indeed, these regulations are the creatures of conventional law, and bind those nations only between whom they are established by special treaty. But the Alligator was a public armed ship, belonging to the navy of the United States, and sent out to cruize against pirates and slave traders, under the different acts of Congress passed for the suppression of these offenders. Captain Stockton was authorized by these laws, and his instructions under them, to seize and subdue all vessels and persons offending against them, wherever they might be found. If every vessel on the ocean has a right to draw around her a magic circle, and to prevent by force the approach of all others, it is obvious that the acts of Congress must remain a dead letter, since they could not be executed without approaching sufficiently near to ascertain the probable character of the vessel. The act of heaving to, on the part of the Marianna Flora, indicated either a desire to speak the Alligator, or to get the weather gage for the purposes of annoyance; and, in either case, it was the duty

*1826.*

*The Marianna Flora.*

of Captain Stockton to change his course, and overhaul the Portuguese ship. But the circumstance of the hostile guns which were soon afterwards fired from the Marianna Flora, without hoisting any national flag, made it still more imperatively his duty to approach her ; and had he avoided the rencounter, he could not have justified his conduct to his government and his country. He had a right, then, to pursue and capture, founded upon the act of Congress, and his instructions. He was justified in considering the ship as having not only attempted, but as having actually committed, a piratical restraint and aggression, within the meaning of the act.

But, independent of the authority derived from this statute, e was justified in pursuing and subduing the aggressor, upon the more general grounds of natural and public law. The right of freely navigating the ocean, and of self-defence, of repelling force by force, was common to both vessels. The Alligator was not bound to decline the combat by flight. In the expressive words of Baron Puffendorf, " in a state of nature, the aggressor hath no right, by which the other party is bound to decline his violence, rather than oppose it; and the reason why a man, under his natural condition, sometimes chooses rather to fly than fight, is not out of any favour to him who sets upon him, but because he thinks it more convenient for his own affairs to fly, *like hares, whose armour is in their feet.*"[a]

[a] L. 2. c. 13. s. 14.

This doctrine has reference to the condition of man in a state of nature; and such was the condition of the parties now before the Court, when upon the ocean, and waging war with each other. The *vindices injuriarum* were not there, and each party became of necessity his own avenger and judge. As to the Alligator not firing a gun in affirmance of her flag, it cannot surely be pretended that such an idle ceremony could give any additional assurance that she was what she pretended to be, or that the general law of maritime states requires any such ceremony. It may be the particular usage of Spain and Portugal, and it may have been adopted between some other nations as a part of the conventional law; but it has reference exclusively to a state of war, and is a mere regulation of the exercise of the belligerant right of visitation and search.

Still less can it be maintained that the Portuguese had reasonable grounds to suspect that the Alligator was a pirate, and had hostile designs upon his ship, and, therefore, he had a right to attack and destroy her. The analogies of the municipal law may assist to illustrate this branch of the inquiry. What degree, or what grounds of fear of bodily harm, will justify an act that may result in the destruction of human life, is, in some cases, a question of great delicacy and difficulty. By the rules of the common law, the rights of the party assailed are confined within very narrow limits. The danger must be manifest, impending, and almost unavoidable. But the writers on natural law may, perhaps, on this

occasion, be more properly cited ; and the fol-
lowing passage from Puffendorf affords the full-
est illustration of the principles applicable to
this subject. " Sometimes," says he, " a doubt
has arisen whether, if one assault me, by mis-
take, without any evil design, but with intent to
employ his force against another, I may kill him
in my own defence. Grotius makes this clear
in the affirmative. (*De J. B. ac P.* lib. 11. c. 1.
s. 2.) Inasmuch as nature obliges us to maintain
peace with others, it may, and ought to be pre-
sumed, that every one will fulfil this obligation,
unless he give manifest evidence of contrary de-
signs." " But now, (speaking of timely prepa-
rations for self-defence,) though my providing
thus far for my security can be injurious to none,
yet, before I can actually assault another under
colour of my own defence, I must have tokens
and arguments amounting to a moral certainty
that he entertains a grudge against me, and has
a full design of doing me a mischief, so that, un-
less I prevent him, I shall immediately feel his
stroke. Among these tokens and signs giving
me a right to make a violent assault upon ano-
ther man, I must by no means reckon his bare
superiority to me in strength and power. 'Tis
a very gross way of philosophizing which some
men have got, when they tell us, by way of ad-
vice, ' He that is able to hurt you, undoubtedly
is willing, and, therefore, without further warn-
ing, down with him.' This kind of doctrine is
manifestly destructive of all social commerce
among men, and the authors commonly cited in

defence of it, either are such whose character
prevents their authority, or else, in the passages
alleged from them, they speak only of precau-
tion in our dealing with those who have given us
sufficient tokens of their resolution to hurt us."[a]

The application of these principles to the case
now in judgment, is too plain to require illustra-
tion, and seems to leave no doubt that the re-
spondents are fully justified as to the act of sub-
duing and capturing the appellant's ship.

The counsel also commented upon a passage
from *Albericus Gentilis*, which had been relied
on by the learned Judge of the District Court as
supporting his decree, but which, it was contend-
ed, had been misunderstood; and, at all events,
was but the opinion of a private individual against
the solemn judgment of a Court of justice in a
case analogous to that now in discussion.[b]

*1826.*

*The Marian-
na Flora.*

a  *Puffend.* l. 2. c. 5. s. 6.
b  *Albericus Gentilis, Hispanicæ Advocationis,* c. 27.
Albericus Gentilis is justly regarded as one of the founders of
the modern law of nations.   He was born in the March of Anco-
na, in the year 1550, and left Italy with his father, an eminent
physician, who was obliged to fly from that country on account of
his religious opinions.   The son afterwards established himself in
England, where he obtained a chair of professor of the civil law
at Oxford, in 1582, and died at London in 1608.  His works are,
*De Jure Belli,* in three books; *De Criminæ Lesæ Majestatis ;
De Nuptiis; Comment. ad. L. 3.   Cod. de Professoribus et Me-
dicis;* and the work above referred to, *Hipanicæ Advocationis,*
which is a collection of opinions given by him as the counsel of Spa-
nish claimants in the English Courts of prize, and may be consider-
ed as the earliest reports of adjudged cases of maritime law   (*Mo-
reri, Dict.*)  "Albericus Gentilis," says Sir James Mackintosh,
" was certainly the forerunner of Grotius,  The opinion enter-

2. The captors were equally justifiable in send-
ing her in for adjudication. It was the exercise

tained, *at the time,* of the difference between them, will be seen in
the following words of Zouch, the pupil and successor of Gentilis
at Oxford. ' He chiefly followed Albericus Gentilis, and Hugo
Grotius, of whom the former justifies all his positions *by authori-
ties of law,* the latter tried his doctrines *by the test of reason.'*"
*Edinb. Rev.* vol. 27. No. 53. art. 9.

Singular mutability of human opinions! Nearly all the writers
cited by Gentilis are now forgotten; he himself is hardly known
except by name; even Grotius is little read, and, however exten-
sive the effects of his great work on his own age, it is now consi-
dered as resting more on the authority of the innumerable writers
of every age and nation cited by him, than on original principles,
or the deductions of reason.

The editor has supposed, that the following translation of the
passage from Gentilis, above referred to, would not be unaccepta-
ble to the reader.

" *Concerning an English vessel which fought with a Tuscan,
and was taken.*

" An English ship was captured by a Tuscan, after an engage-
ment, and confiscated. The Florentine Judges state, as the ground
of this decree, that the English ship was the aggressor, and that
the Florentine acted only in necessary defence. With submission,
your honours, I will reply, that your premises are void of proba-
bility, your conclusion of truth. *For instance; he is presumed
the aggressor, who supposed himself injured; in such a case,
where it is a question of intention, opinion is sufficient.* The
Tuscan may have supposed himself injured by the *commerce* of
the English with the Turks. [Therefore, the Tuscan, not the
Englishman, was the aggressor.] *Again; he is presumed the
aggressor who lies in wait, in arms.* Such was the case of the
Tuscan, who (as appears from what he had done to other vessels
of ours) was cruizing for our merchantmen in that trade. *Again;
he is presumed the aggressor, who is superior in strength.* And
who does not see the Tuscan vessel of war was stronger than our
merchantman? Again; he is presumed the aggressor, who, being
armed, is accustomed to conflicts. Does this character also suit
the merchantman, or, rather, the cruizer? *Finally; he is pre-*

both of a right and a duty. Taking it for grant-  1826.
ed, that there was a right to subdue, and to cap-

*sumed the aggressor, who, under the circumstances already
stated, conquers.* And which is he ? Why do we ask ; the de-
cree of condemnation declares that the Tuscan first fired twice on
the Englishman.

" *Again ; did not the Tuscan begin the battle ?* He is consi-
dered as beginning who has provoked to the battle, to hostility ;
and he is considered principal in the crime, with whom the malice
began, and to him, as the aggressor, are justly imputed the conse-
quences. *And will those Judges tell me, that it is a practice and
sign of amity to fire once and again?* It is the custom of a ship
of war hailing another vessel, and assuming this authority. The
Tuscan vessels practised this at that time, and in other cases.
*Then, the defence of the English was against a claim of autho-
rity, against threats.* The object of the Tuscans was to search
our ship, as appears from their transactions with others; they
came, therefore, to interrupt our navigation, to intercept our com-
merce, as appears from what they did with others. Deeds declare
the intention. The deed of the Tuscans was unlawful, if a hunts-
man cannot lawfully enter another man's farm without the owner's
permission ; if it is unlawful to injure an enemy, in a neutral terri-
tory, and if territory in this respect differ not from jurisdiction.
Neither shall the custom above alluded to (if ever any where so
received) be now obtruded upon me as a law of the sea relative to
the power of ships of war; for, although the custom may be ad-
mitted on the shores of the prince to whom the vessel belongs, it
cannot in other seas. Nor let us regard the opinion of those cus-
tomary jurists, but adhere to those who proceed on general princi-
ples. [*They* teach that] *The defence of the English was just, fear-
ing an attack. And the bare preparation of another against
one giving me a right to assault and slay him. In fact, I am not
obliged to wait till I am assailed.* I have a right to commence.
This is the opinion more favourable to humanity, and proved from
facts on trial, and is also confirmed by all the writers. ' *We must
go to meet the assault, [say they,] not only that which actually
exists, but that which may take place.*'

ture, the right to send in for adjudication follows as a corollary. The right to seize depended upon

" The defence of the English was justifiable even on the behalf of the Turks, who were to suffer injury from the Tuscans in our ship. For, an injury is done to us, which is done to another in our house; and a ship is compared to a house. So, an injury done to a fellow traveller, is done to us. It was, therefore, commendable for us to defend those whom we had undertaken to carry. Nay, we ourselves were entitled to be spared, although carriers [of enemy's property, simply as such] should not be so entitled. It was still necessary for us to defend ourselves, through fear lest we should suffer, by being confounded with the Turks, and by a wish to save our own property. Thus, in a case still harder to defend, Cravetta held, when a city shut its gates on its lord, through fear of being ravaged, and for the sake of preserving its property, and in order that, with a few guilty, the remaining innocent might not be confounded.

" If, then, it was a defence of ourselves, and a just defence, the attack of the Tuscans must have been unjust. But, grant that their attack was just. Certainly, in the doubtful conflict of just attack, and just defence, every one will think the defence entitled to favour. There are all degrees of just, equitable, and favoured, and that which is more just, is to be preferred to that which is less so. *But, grant that the assault was on our side, and that it was unjust. Shall a stipulated surrender avail us nothing? They are not regarded as captured, who have surrendered, even from extreme necessity.*

" But, grant that they were captured, are persons and property captured the perquisites of the captor? On this supposition, there is a kind of war between us and the Tuscans, and this a battle between enemies, which, therefore, must be adjudged by the public rules of war, and not those of pirates and murderers. The most learned Alciati is to the contrary, and the plainest law teaches that neither captured persons nor goods accrue to the captor.

" But, grant that captured goods do accrue to the captor; the goods, in this case, did not belong to the combatants; and the deed of these mariners must not prejudice the owners. The mariners

the fact of the offence committed by the captured vessel. The captors had no authority to apply the law to the fact, to sit in judgment upon the case, and to inflict summary justice on the offender. Still less could the commander of a public ship be expected to assume the responsibility of suffering the offender to escape. It was apparently a piratical, or, at least, a hostile aggression against the law of nations, which had been committed upon a public vessel of the United States. It is not essential to constitute the piratical restraint and depredation, which is meant to be punished by the act of Congress, that there should be an intent to rob or plunder. Any wanton attack on a vessel, on the high seas, and especially an attack with an intent to sink the vessel, and destroy the lives of the officers and crew, is clearly within the letter and the spirit of the act. If a homicide had been occasioned by this aggression, it could not be considered as justifiable or excusable, upon the principles of the criminal code of this, or any other civilized country ; and not being justifiable or excusable, it would be a

<div style="margin-right:0;">1826.<br>The Marianna Flora.</div>

are not to be understood to have done wrong by the order of the owners ; nor the latter to have given orders otherwise than according to mercantile usage. ' The owners must not suffer, although the mariners should say they had acted according to orders.'

" See how, even in the liberal concessions I have made in the defence, the mariners would hardly be responsible, the owners not at all. But, since the defence of the mariners was on every principle just, what follows but that the Tuscans should restore to us, as to persons plundered, every thing taken away, with damages, costs, interest, profits, &c. to the last farthing."

1826.   case of murder, and if a case of murder, of pi-
ratical murder.   Now, if the act attempted to be
The Marian-
na Flora.   done would have been piratical, the attempt also
was piratical.   It may, indeed, be said, that the
act of Congress is broader than the rule of inter-
national law on this subject ; that, by the law of
nations, an attempt to commit a piracy is not a
piracy ; and, therefore, the detention and sending
in for adjudication was unlawful.   Supposing
this to be so, *argumenti gratia,* still the judicial
tribunals of this country are bound to protect the
officer who acts under it, and in obedience to it.
This very question of an apparent collision be-
tween the law of nations and a municipal ordi-
nance, was presented to the mind of that great man
who presides in the British High Court of Admi-
ralty, in the memorable case of the orders in
council, and disposed of without hesitation or
difficulty, upon the plain and intelligible ground,
that he could not presume the prize ordinances
of his own country to be repugnant to the law
of nations.[a]

But, supposing it not to be a piratical aggres-
sion, or an attempt to commit one, still it was an
act of deliberate, wanton, flagrant hostility, com-
mitted against the law of nations, and the rights
of this country as one of the community of na-
tions.   For such an offence there must be some
punishment, and the appropriate penalty inflict-
ed in analogous cases, is that of confiscation.
Thus, in the case of the *Anne,*[b] this Court con-

a *Edw. Adm. Rep.* 311.   The Fox.
b 3 *Wheat. Rep.* 435.

demned, as prize of war, enemy's property taken  <span>1826.</span>
within neutral jurisdiction, upon the ground, that <span>The Marian-</span>
the captured vessel had made the first attack <span>na Flora.</span>
upon the captor, and, by this act of aggression
on the other belligerant, had disturbed the
state of peace which is always supposed to ex-
ist in a neutral port.

3. There was probable cause, such as will ex-
empt the captors from damages. Probable cause
is, where a seizure is made under circumstances
which warrant suspicion, and upon evidence less
than that which would justify condemnation.[a]
No case can be shown where a Court of the law
of nations has decreed damages merely for bring-
ing in for adjudication, if the original seizure was
justifiable, unless under peculiar circumstances
not affecting the principle, or its application to
the present case. The learned counsel here
cited and classified all the cases to be found in
the English books, where damages had been
given or refused ; and deduced from them the
general inference, that wherever there is proba-
ble cause for the original seizure, the captors
are only liable to make simple restitution, even
if upon adjudication it turns out that their suspi-
cions were groundless.[b]

a 7 Cranch's Rep. 348. Locke v. United States.
b The three classes of cases affecting this question, are,
(1.) Where damages have been given or refused on restitution.
(2.) Where compensation has been given, or refused, the prize
being lost in the hands of the captors. (3.) Where, although
restitution was decreed, the captors have been allowed their costs
and expenses.
I. In the Corier Maritimo, (1 Rob. 287.) demurrage was given

1826.          As to the decision of this Court in *Murray* v.
The Marian-  *The Charming Betsey*,[a] it is affirmed by Mr.
na Flora.

for unnecessary detention, and unjustifiable delay in proceeding to adjudication. In the *Zee Star*, (4 *Rob.* 71.) demurrage was given to the claimants, and costs and expenses refused to the captors, (which are usually allowed even on restitution,) for improper delay in proceeding to adjudication. In the *Triton*, (4 *Rob.* 78.) costs and damages were given to the claimant of the goods, and demurrage for the ship, for seizure on an insufficient ground. In the *Madonna del Burso*, (4 *Rob.* 169.) all the circumstances concurred of a seizure originally unjustifiable, protracted detention, and improper delay in proceeding to adjudication : costs and damages were given. The *Peacock*, (4 *Rob.* 185.) was the case of an unjustifiable detention of the prize vessel, carried into Lisbon, and delay in bringing her home to England for adjudication. The *Wilhelmsburg*, (5 *Rob.* 143.) demurrage allowed, and the expenses of the application given against the captors, for loss arising from his not bringing the captured vessel to *the most convenient port for adjudication*, within the meaning of the prize act. In the *Zacheman*, (5 *Rob.* 152.) which was a mistake as to the law of contraband under the Swedish treaty, and the seizure was pronounced perfectly justifiable, demurrage was allowed for unreasonable delay. The *Anna*, (5 *Rob.* 382.) was a case of restitution, with costs and damages, for a violation of the neutral territory of the United States. The seizure itself was pronounced to be unjustifiable, and costs and damages were given, because the prize ship was improperly brought from the mouth of the Mississippi to England for adjudication, instead of being carried into one of the West India islands. In the *Washington*, (6 *Rob.* 275.) damages were given for bringing the vessel to an inconvenient port. The *Acteon* (2 *Dods.* 48.) was an American ship sailing under a license, unlawfully seized and burnt. The *St. Antonio* (*Acton*, 113.) was sailing under a license to enter the port of Holland, but was seized under suspicion of an intention to go to a French port. On bringing in, the captors offered to liberate on payment of their expenses, but afterwards retracted, and went on to adjudication.

a 2 *Cranch's Rep.* 116. 122.

Dallas, arguendo, as a general principle of maratime law, that probable cause will justify a marine seizure, is not denied by the opposite counsel, and is impliedly conceded by the Court in its judgment, the whole scope of which goes upon

There was a decree of restitution, and the claimants appealed to the Lords for costs and damages; the appeal was rejected, and the claimants condemned to pay the costs of the appeal. In the *Catharina Elizabeth*, (*Acton*, 309.) costs and damages were given by the Lords for carrying the captured vessel to an inconvenient port. In the *Louis*, (2 *Dods.* 210.) damages were refused by Sir W. Scott, although he held the seizure clearly illegal, it being a case of the first impression.

II. The rule on the subject of compelling the captors to proceed to adjudication, where the property is lost in their hands, is, that where the seizure is unjustifiable, the captor is answerable for every loss or damage. In cases of justifiable seizure, he is responsible for due diligence only, and is held to simple restitution in value.

The *Carolina*, (4 *Rob.* 255.) was a neutral ship which had been employed in carrying French troops to Egypt, and was taken coming away. Had she been taken in actual *delicto*, she would have been liable to condemnation. The captors were held exempt, not only from costs and damages, but from restitution in value, the ship having been lost while in their possession by stress of weather. In the *William*, (6 *Rob.* 316.) the original seizure was held justifiable, but restitution in value was decreed for a loss occasioned by not taking a pilot on board, but no damages were given. In the *Der Mohr*, (3 *Rob.* 129.) the original seizure was considered as justifiable, but the captors were held responsible to make restitution in value (not for costs and damages) on account of the loss of the vessel by the ignorance and wilfulness of the prize master.

III. In general, the captors are allowed their expenses and costs on restitution, whenever there is probable cause of capture. The *Imina*, (3 *Rob.* 167.) The *Principe*, (*Edw.* 70.) The only exceptions to this rule are where there has been some negligence or misconduct on the part of the captors. There are a great number of cases on this head, which it was deemed unnecessary to cite.

1826.

The Marianna Flora.

an inference of fact from the evidence, that there was not probable cause of seizure, showing, that if there had been, damages would not have been given.    In *Little* v. *Bareme*,[a] the Court did not deem it necessary to determine whether the probable cause afforded by the conduct of the captured vessel to suspect her of being an American, would exempt the captors from damages, because it was of opinion that had she been so, the seizure would still not have been warranted by the law.    And the case of *Maley* v. *Shattuck*,[b] was the application of the ordinary principle of the Prize Court, that if the seizure is without probable cause, the captors are liable to make restitution, with costs and damages, even if the property be lost without their fault; evidently implying, that if there had been probable cause for the original seizure, they would not have been so liable.

Mr. *Webster*, on the same side, entered into a minute examination of the evidence, in order to show that the party, who was in fact the wrong doer, and the aggressor, now appeared before the Court in the character of a plaintiff, seeking redress for a supposed injury done to himself.    It had been said, that the owners of the ship, and of the cargo, were not to be held responsible for the misconduct of the master. There were two answers to this objection: (1.) That it was not the captors who were seek-

---

a 2 *Cranch's Rep.* 169.                b 3 *Cranch's Rep.* 458.

ing to punish the owners, but the owners who
were seeking compensation against the captors
for the consequences of the misconduct of their
own agent. (2.) That the universal principle,
applied by Courts administering the law of na-
tions, was to consider the thing taken *in delicto*,
as responsible, whether it was the property of
the master, or of others. In cases of blockade,
of contraband, of carrying enemy's property with
false papers, of resistance to visitation and
search, he is considered as the agent of the owner
both of ship and cargo. So, also, the revenue
laws, from the necessity of the case, regard him
in that character, and subject the vessel and goods
under his control to confiscation for his unlawful
acts. In every case, until the innocent are sepa-
rated from the guilty, until examination and regu-
lar adjudication can be had, the law is compelled
to regard the ship, and every thing on board, as
belonging to the master.

It had also been contended, that though the
original seizure might be justifiable, the captors
were liable in costs and damages for not releas-
ing the vessel after she was subdued and seized.
But it was not pretended that Captain Stockton
had authority to punish her himself; and, there-
fore, unless the Portuguese ship had, notwith-
standing all that had happened, a clear right to go
off with impunity, he had an unquestionable right
to send her in for adjudication. If she had a
right to pursue her voyage, she would have had
the same right if the consequences of her aggres-
sion had been ever so calamitous; if she had

1826.

The Marian-
na Flora.

crippled the Alligator, and destroyed half her crew. The actual consequences being less serious, do not affect the right, though they may the exercise of discretion. But we have nothing to do here with the question of military discretion. The captured vessel had made war. She had committed what was, *prima facie*, a piratical restraint and depredation. If unexplained, it was piracy. Whether it could be satisfactorily explained, or excused, was a question to be decided by the civil tribunals. It was not too much to say, that the captors had here something of a belligerent right. The act of Congress was not a mere municipal law; it was a prize ordinance. The seizure was not a mere municipal seizure. War against pirates existed, and the act was intended to define who should be treated as pirates. And, even if the Court should *now* be of opinion, that the captured vessel ought not, under all the circumstances, to be sent in, still the question recurs, whether Captain Stockton might not, *at that time*, have thought otherwise. He was called on, suddenly, to decide and act on a question full of difficulties, and which has occasioned no little embarrassment to the civil tribunals, with all the advantages of a deliberate examination. Even with these advantages, the learned Judges of the Courts below have differed in their judgments upon it; and yet, it is now contended, that this naval commander was bound to be better instructed in the laws than those whose peculiar duty it is to study and expound them. Upon these grounds it was, that Sir W. Scott

determined, in the case of the *Louis,*[a] that it being a case *primæ impressionis,* the captors were exempt from costs and damages, although the Court was clearly of opinion, that the seizure itself was unjustifiable, a right of search not existing in time of peace. A doubt respecting the true construction of the law, is as reasonable a ground for seizure, as a doubt respecting the fact.[a] But, here was doubt respecting both fact and law, and that doubt is not yet cleared up. The capture was made in repelling what appeared, at the time, to be an act of piratical aggression. It has turned out not to be so, after a judicial examination. But, the question is, what it appeared to be *recenti facto.* It cannot be maintained, that an habitual course of piratical depredation is necessary to constitute the offence of piracy A single act of piratical aggression, stimulated by revenge, or national prejudice, or wanton cruelty, would be sufficient. The act of Congress evidently supposes it, and is in conformity with the public law.

It had also been argued, that this was a municipal seizure, and that the vessel having been restored without a certificate of probable cause, costs and damages followed as a matter of course. But, it was insisted, that municipal seizures are for offences within our own territorial jurisdiction, or by our own citizens elsewhere. Here, the proceedings are under the law of nations; and, if found guilty, the property would be con-

1826.

The Marianna Flora.

a *2 Dods. Rep.* 210. 264.          b *5 Cranch's Rep.* 311.

1826.

The Marianna Flora.

demned, not for a municipal offence, but as prize, and distributed as prize. And, even if it had been a municipal seizure, it could not be admitted that such consequences would necessarily follow in every case, without regard to its circumstances. The true principle applicable to seizures of every kind was, that the party having a right to cruize, and bring in some vessels, if others so conduct as to give themselves the character of those who are liable to capture, they would be entitled to nothing but simple restitution. This is laid down in clear and satisfactory terms by Sir W. Scott. " The natural rule is, that if the party has been unjustly deprived of his property, he ought to be put as nearly as possible in the same state as he was before deprivation took place ; technically speaking, he is entitled to restitution *with costs and damages*. This is the general rule ; but, like all other general rules, it must be subject to modifications. If, for instance, any circumstances appear, which show that the suffering party has himself furnished occasion for the capture ; if he has, by his own conduct, in some degree contributed to the loss ; then he is entitled to a somewhat less degree of compensation, to what *is* technically called *simple restitution.*"[a]

Mr. *Emmett*, for the appellants, in reply, argued, that the second count in the libel filed in the Circuit Court, charging a hostile aggression, was inadmissible, as the original subject matter

*a* The Acteon, 2 *Dods. Rep.* 48.

of the suit was originally cognizable in the District Court, (where the ship and cargo had been acquitted from the original charge of a *piratical* aggression,) and to allow such an amendment would be to institute an original, and not an appellate proceeding, in the Circuit Court.

The appellants were entitled to damages as claimed. The capturing vessel derived her right under the municipal law. The piracy alluded to in the act of Congress is sea robbery. It is an act to protect commerce ; and the history of the times shows, that the great evil to be remedied was the system of depredations on the ocean. They were, indeed, frequently accompanied with murder, and various other enormities. But these were only subservient to the system of plunder, and intended only to facilitate or conceal the crimes of the offenders. The piracy referred to is, that by the law of nations, and not by any peculiar law of the United States.[a] And, even if our statutory piracy had been contemplated in this act, it would not apply to the present case. The Crimes Act of 1790, defines the piracy created by that statute to be " murder, or robbery, or any other offence, which, if committed within the body of a county, would, by the laws of the United States, be punishable with death." Now, as the firing by the Portuguese did no mischief, no offence was committed, which, if committed on land, would be punishable with

[a] United States v. Smith, 5 *Wheat. Rep.* 153. United States v. The Pirates, 5 *Wheat. Rep.* 184.

death.  Besides, it has been determined, that this section of the Crimes Act does not extend to foreign vessels.[a]  For the purposes of this case, then, if not for the purposes of every case, it may be assumed, that the piratical aggression mentioned in the act of the 3d of March, 1819, c. 76. must be with intent to rob or plunder.  Nor can the act affect the antecedent rights of other nations.  It did not, and could not, create a state of war.  Pirates are, indeed, called *hostes humani generis;* but the use of such metaphorical language is often calculated to mislead, and to confound our ideas of legal rights.  They are, indeed, public offenders, like the highway robber, but they are not public enemies so as to give those who cruize against them any of the rights of war in respect to the subjects of friendly states who are not involved in their guilt.  The act could not give to our own ships the right of visitation and search, or any other belligerent rights, so far as respects foreign nations.  It could not affect the pre-existing right of Portuguese subjects to maintain for themselves the privileges of a state of peace.  Its utmost effect would be to impose on vessels of this country the obligation to submit to examination, and the seizures it authorizes must be regarded as strictly municipal.  The commissioned vessel must, therefore, act on credible information, or on evidence it has of acts of piracy.  A claim to exa-

---

*a* United States v. Palmer, 3 *Wheat. Rep.* 610.  United States v. Clintock, 5 *Wheat. Rep.* 144.

mine or detain vessels of another nation on sus-
picion, without information or evidence, would
be as large as the belligerent right of search,
though under another name. If the commission-
ed vessel acts against a foreign vessel, it acts at
its own peril, and (more especially when it acts
without information or evidence) must abide the
consequences as to damages if it has acted erro-
neously. In captures *jure belli*, if there be pro-
bable cause, the captors are entitled, as of right,
to an exemption from damages ; but, in case of a
municipal seizure, there must be some provision
of positive law creating and defining the exemp-
tion. The party who seizes does it at his pe-
ril ; if condemnation follows, he is justified ; if an
acquittal, then he must make compensation, un-
less he can protect himself under some statute.[a]

It has been said, that under this construction,
the act would become a dead letter. The same
was said in the case of the *Louis*, and the answer
of Sir W. Scott to the objection is conclusive
and pertinent to the present case.

But the objection is unfounded. The dange-
rous pirates are, for the most part, not difficult to
distinguish. Their haunts, their habits, their ap-
pearance, point them out ; and though the com-
missioned officer acts at his own risk, yet if he
act on those indicia, and on information and evi-
dence, and stays his hand where he can find no
trace or evidence of guilt, he incurs no real dan-

The Apollon, 9 *Wheat. Rep.* 372.

ger of being liable to damages ; and, in any event, may rely on the justice and liberality of his own government for protection. This is also the doctrine of the municipal law in analogous cases on land, both criminal and revenue proceedings.

One of the privileges of a state of peace, which the Portuguese have still a right to maintain for themselves, is the benefit of the principle, that on the high seas the merchantman is equal to the man-of-war. Each may protect itself according to its sense of expediency and necessity, and resist the doing of any thing by the other, *as a right,* which is not a right. If the man-of-war has no right to examine, the merchantman has a right to resist that examination. Even in war, a vessel navigating the ocean may, to a certain extent, draw a line of jurisdiction around itself. This is proved by the restrictions put on the right of search. It is said, indeed, that these are the result of treaty stipulations. But they are the result of a true interpretation of the law of nations, and have been recognised in treaties, because England had practically violated the right. *A fortiori,* in time of peace may every vessel draw a circle of jurisdiction around itself, and resist the exercise of that search and visitation which is not lawful in time of peace. It is upon this ground that Sir W. Scott held the doctrine, that if a neutral resist search, not knowing of the existence of a war, it is no ground of condemnation ;[a] and that still more recently he has

[a] The St. Juan Baptista, 5 *Rob. Rep.* 36.

determined that the right of visitation and search does not exist, and cannot be exercised in time of peace.[a] Every ship navigating the ocean in time of peace may appropriate to her temporary use so much of it as is necessary to her protection, consulting the equal rights of others. It is a right that will lie dormant, and never be exercised except upon real apprehension. When there is no apprehension of danger, the consent to approach will never be withheld. But the right to approach *in invitum* can never exist; and, both parties being independent and equal, each party is to judge for himself as to the extent and reality of that danger. Unless this exclusive right of judgment is maintained, the approach of pirates could never be prevented, who frequently assume the flag of public ships, and fall upon their victims under this disguise.

    The learned counsel here argued upon the evidence to show, that upon a just application of these principles, the conduct of the Marianna Flora was perfectly justifiable. The first fault was committed by the Alligator in chasing, and not affirming her flag with a gun. This is the law of nations, and recognised as such by every maritime nation on the continent of Europe. The language of *Azuni* on this subject is peculiarly appropriate to the present case. He says, " the fear of meeting with a pirate, and being the dupe of deceitful appearances, is the reason why

<div style="margin-left:2em;">1826.<br>The Marianna Flora.</div>

---

    *a* The Louis, 2 *Dods. Rep.* 210.

no credit is given to the *flag* of a vessel, *though a ship of war.*"[a]    Had the flag been affirmed, in this instance, in the manner to which the Portuguese are accustomed, they would not have resisted the attempt to approach their vessel, and all the present consequences would have been avoided.

They might also have been avoided, by that deliberate and impartial examination, which it was Captain Stockton's duty to make, before he decided on sending in the ship for adjudication. It would have been his duty, even in war, to examine faithfully the ship's papers, and pay due respect to the evidence produced.[b]    But, it is said, that the usual documentary evidence would prove nothing, since it was not a question of proprietary interest or neutral character.    The answer is, that the ship's papers would have shown, that the *vessel*, whom he treated as a pirate, was an innocent merchantman; and that the *cargo* was not liable, by the act, to confiscation, even if the vessel had been guilty of a piratical aggression.    The 4th section of the act only subjects the *vessel or boat* to confiscation, and even that must be understood with the implication that they are the property of the wrong-doers; for the master can never be considered as the owner even of the ship, so as to subject it to forfeiture for his criminal acts, much less can he be considered as the owner of the cargo for such a pur-

*a*  2 *Azuni*, 204. 602. c. 3. § 3.
*b*  The Anna Maria, 2 *Wheat. Rep.* 327.    2 *Azuni*, 212. § 8.

pose.   In the words of this Court, it may be said,
that, " however general and comprehensive the
phrases used in our municipal laws may be, they
must always be restricted in construction to places
and persons upon whom the legislature has au-
thority and jurisdiction."[a]

Nor can it be maintained that here was an act
of private unauthorized war committed by the
Portuguese, which, being a violation of the law of
nations, would subject the vessel, if taken *in de-
licto*, to confiscation.  Private war never gives
the right of capture and confiscation.[b]  That
belongs to public war alone.  In time of war,
every violation of belligerent rights is followed
by condemnation, because it is considered as evi-
dence of enemy's property, which, by the laws
of war, is transferred to the capturing power.
But, in time of peace, to make every violation
of the law of nations, however slight, produce
the condemnation of property, however valuable,
and belonging to innocent persons, would reduce
the law of nations to the sweeping severity of
Draco's code.

In this case, the sending in for adjudication has
been sought to be justified by hypothetical rea-
soning, grounded upon the supposition that lives
might have been lost; and a learned discussion
of the municipal law of homicide was entered
into, to show, that if any of the Alligator's crew

a   The Apollon, 9 *Wheat. Rep.* 370.
b   *Stewart's Vice Adm. Rep.* 301.

had been killed, it would have been murder; and, then it is asked, whether it would not have been Captain Stockton's duty to send in for trial, for what would have been clearly piracy. But we are to deal with the case as we find it. No lives were, in fact, lost; no injury done to the vessel. It was nothing but the offence of firing, and in self-defence, against a vessel that turned out to be a public ship of war, but which did not at first manifest her character in the mode to which the Portuguese had been accustomed. Was it possible to suppose that such an act could produce the confiscation of the cargo belonging to innocent owners, or of the ship, the owner of which was equally innocent? It was at most a marine trespass, cognizable in the Courts of the offender, because it was not a case of war, nor to be determined by the law of war; or if there were a doubt whether there was any thing of national insult in it, it might be a fit subject to be represented to this government for diplomatic discussion. But, after the ship and cargo were brought in; and it was ascertained that she could not be subjected to confiscation, why were they detained and proceeded against as if captured *jure belli?* Here are a series of wrongs, for which they who suffer damage must look for compensation to him whom the law considers as the wrong doer, although many of them were the acts of his agents, and done in his absence. They do not seek vindictive damages, but simple compensation only. The long list of cases which

has been arrayed against us cannot furnish a rule for a seizure, which was not made *jure belli*, but which (if to be justified at all) must be considered as having been made in execution of a municipal statute. Will probable cause, even if it existed, furnish a defence in such a case? That is not the law of *Hoyt* v. *Gelston*,[a] which was a seizure under an act of Congress, and where there was probable cause, though it was not certified by the Court according to the statute. Is it the law of any case where the wrong doer acts under municipal laws on his own responsibility? Is it the law to be collected from the cases of the *Acteon*,[b] of *Murray* v. *The Charming Betsey*,[c] of *Little* v. *Bareme*,[d] of the *Jeune Eugenie*,[e] or even of the *Louis?*[f] In the last case, indeed, damages were refused, because it was *primæ impressionis* —a case of some doubt and difficulty as to the new construction of the law of nations, and the application of the French decree respecting the slave trade, and the parties seeking damages were stained with crime. But here the law is old, and well settled; and nothing but the offence is of novel impression. The parties are innocent; and the very novelty of the offence ought more certainly to secure its punishment.

Mr. Justice STORY delivered the opinion of the *March 20th.*

a 13 *Johns. Rep.* 141. 561.   3 *Wheat. Rep.* 246.
b 2 *Dods. Rep.* 48. 52.   c 2 *Cranch's Rep.* 125.
d 2 *Cranch's Rep.* 170.   e 2 *Mason's Rep.* 409. 439.
f 2 *Dods. Rep.* 210.

1826.

The Marianna Flora.

Amendment of the pleadings by adding a new count to the libel.

Court, and after stating the pleadings, proceeded as follows:

An objection, which is preliminary in its nature, has been taken to the admissibility of this new count to the libel, filed in the Circuit Court, upon the ground, that the original subject matter was exclusively cognizable in the District Court; and to allow this amendment would be to institute an original, and not an appellate inquiry in the Circuit Court. But the objection itself is founded on a mistaken view of the rights and authorities of appellate Courts of admiralty. It is the common usage, and admitted doctrine of such Courts, to permit the parties, upon the appeal, to introduce new allegations, and new proofs, *non allegata allegare, et non probata probare.* The Courts of the United States, in the exercise of appellate jurisdiction in admiralty causes, are, by law, authorized to proceed according to the course of proceedings in Admiralty Courts. It has been the constant habit of the Circuit Courts, to allow amendments of this nature in cases where public justice, and the substantial merits, required them; and this practice has not only been incidentally sanctioned in this Court; but on various occasions in the exercise of its own final appellate jurisdiction, it has remanded causes to the Circuit Court, with directions to allow new counts to be filed. We may, then, dismiss any farther discussion of this objection, and proceed to the main questions in controversy. [Here the learned judge recapitu-

lated the facts of the case as they have been be-
fore stated.]

In considering the circumstances, the Court
has no difficulty in deciding, that this is not a
case of a piratical aggression, in the sense of the
act of Congress. The Portuguese ship, though
armed, was so for a purely defensive mercantile
purpose. She was bound homewards with a va-
luable cargo on board, and could have no motive
to engage in any piratical act or enterprise. It
is true, that she made a meditated, and, in a sense,
a hostile attack, upon the Alligator, with the
avowed intention of repelling her approach, or
of crippling or destroying her. But, there is no
reason to doubt, that this attack was not made
with a piratical or felonious intent, or for the pur-
pose of wanton plunder, or malicious destruction
of property. It was done upon a mistake of the
facts, under the notion of just self-defence,
against what the master very imprudently deem-
ed a piratical cruizer. The combat was, there-
fore, a combat on mutual misapprehension; and
it ended without any of those calamitous conse-
quences to life which might have brought very
painful considerations before the Court.

It has, indeed, been argued at the bar, that
even if this attack had been a piratical aggres-
sion, it would not have justified the capture and
sending in of the ship for adjudication, because
foreign ships are not to be governed by our mu-
nicipal regulations. But the act of Congress is
decisive on this subject. It not only authorizes a
capture, but a condemnation in our Courts, for

Margin notes:
Not a case of piratical aggression under the act of Congress.

The act extends to foreign vessels

1826. such aggressions; and whatever may be the responsibility incurred by the nation to foreign The Marian-na Flora. powers, in executing such laws, there can be no doubt that Courts of justice are bound to obey and administer them.

Not a case of hostile aggression for which the property taken *in delic-to* is subject to confiscation by the law of nations. The other count, which seeks condemnation on the ground of an asserted hostile aggression, admits of a similar answer. It proceeds upon the principle, that, for gross violations of the law of nations on the high seas, the penalty of confiscation may be properly inflicted upon the offending property. Supposing the general rule to be so in ordinary cases of property taken *in delicto*, it is not, therefore, to be admitted, that every offence, however small, however done under a mistake of rights, or for purposes wholly defensive, is to be visited with such harsh punishments. Whatever may be the case, where a gross, fraudulent, and unprovoked attack, is made by one vessel upon another upon the sea, which is attended with grievous loss or injury, such effects are not to be attributed to lighter faults, or common negligence. It may be just, in such cases, to award to the injured party full compensation for his actual loss and damage; but the infliction of any forfeiture beyond this does not seem to be pressed by any considerations derived from public law.

Pirates may, without doubt, be lawfully captured on the ocean by the public or private ships of every nation; for they are, in truth, the common enemies of all mankind, and, as such, are liable to the extreme rights of war. And a pira-

tical aggression by an armed vessel sailing un-    1826.
der the regular flag of any nation, may be justly   The Marian-
subjected to the penalty of confiscation for such    na Flora.
a gross breach of the law of nations.    But every
hostile attack, in a time of peace, is not neces-
sarily piratical.    It may be by mistake, or in ne-
cessary self-defence, or to repel a supposed medi-
tated attack by pirates.    It may be justifiable,
and then no blame attaches to the act; or, it may
be without just excuse, and then it carries re-
sponsibility in damages.    If it proceed farther,
if it be an attack from revenge and malignity,
from gross abuse of power, and a settled purpose
of mischief, it then assumes the character of a
private unauthorized war, and may be punished
by all the penalties which the law of nations can
properly administer.

These latter ingredients are entirely wanting
in the case before us ; and, therefore, if the ques-
tion of forfeiture were now in judgment, we
should have no doubt, either upon the act of Con-
gress, or the general law, that it ought not to be
enforced.

But, in the present posture of this cause, the
libellants are no longer plaintiffs.    The claim-
ants interpose for damages in their turn, and have
assumed the character of actors.    They contend
that they are entitled to damages, first, because the
conduct of Lieutenant Stockton, in the approach
and seizure of the Marianna Flora, was unjusti-
fiable ; and, secondly, because, at all events, the
subsequent sending her in for adjudication was
without any reasonable cause.

1826.

The Marian-
na Flora.

Rights and du-
ties of armed,
and     other
ships, naviga-
ting the ocean
in   time   of
peace.

In considering these points, it is necessary to ascertain what are the rights and duties of armed, and other ships, navigating the ocean in time of peace. It is admitted, that the right of visitation and search does not, under such circumstances, belong to the public ships of any nation. This right is strictly a belligerent right, allowed by the general consent of nations in time of war, and limited to those occasions. It is true, that it has been held in the Courts of this country, that American ships, offending against our laws, and foreign ships, in like manner, offending within our jurisdiction, may, afterwards, be pursued and seized upon the ocean, and rightfully brought into our ports for adjudication. This, however, has never been supposed to draw after it any right of visitation or search. The party, in such case, seizes at his peril. If he establishes the forfeiture, he is justified. If he fails, he must make full compensation in damages.

Upon the ocean, then, in time of peace, all possess an entire equality. It is the common highway of all, appropriated to the use of all; and no one can vindicate to himself a superior or exclusive prerogative there. Every ship sails there with the unquestionable right of pursuing her own lawful business without interruption; but, whatever may be that business, she is bound to pursue it in such a manner as not to violate the rights of others. The general maxim in such cases is, *sic utere tuo, ut non alienum lædas.*

It has been argued, that no ship has a right to

approach another at sea; and that every ship has a right to draw round her a line of jurisdiction, within which no other is at liberty to intrude. In short, that she may appropriate so much of the ocean as she may deem necessary for her protection, and prevent any nearer approach.

This doctrine appears to us novel, and is not supported by any authority. It goes to establish upon the ocean a territorial jurisdiction, like that which is claimed by all nations within cannon shot of their shores, in virtue of their general sovereignty. But the latter right is founded upon the principle of sovereign and permanent appropriation, and has never been successfully asserted beyond it. Every vessel undoubtedly has a right to the use of so much of the ocean as she occupies, and as is essential to her own movements. Beyond this, no exclusive right has ever yet been recognised, and we see no reason for admitting its existence. Merchant ships are in the constant habit of approaching each other on the ocean, either to relieve their own distress, to procure information, or to ascertain the character of strangers; and, hitherto, there has never been supposed in such conduct any breach of the customary observances, or of the strictest principles of the law of nations. In respect to ships of war sailing, as in the present case, under the authority of their government, to arrest pirates, and other public offenders, there is no reason why they may not approach any vessels descried at sea, for the purpose of ascertaining their real characters. Such a right seems

indispensable for the fair and discreet exercise of their authority; and the use of it cannot be justly deemed indicative of any design to insult or injure those they approach, or to impede them in their lawful commerce. On the other hand, it is as clear, that no ship is, under such circumstances, bound to lie by, or wait the approach of any other ship. She is at full liberty to pursue her voyage in her own way, and to use all necessary precautions to avoid any suspected sinister enterprise or hostile attack. She has a right to consult her own safety; but, at the same time, she must take care not to violate the rights of others. She may use any precautions dictated by the prudence or fears of her officers; either as to delay, or the progress or course of her voyage; but she is not at liberty to inflict injuries upon other innocent parties, simply because of conjectural dangers. These principles seem to us the natural result of the common duties and rights of nations navigating the ocean in time of peace. Such a state of things carries with it very different obligations and responsibilities from those which belong to public war, and is not to be confounded with it.

Whether the conduct of the captor was justifiable in subduing and seizing the vessel.

The first inquiry, then, is, whether the conduct of Lieutenant Stockton was, under all the circumstances preceding and attending the combat, justifiable. There is no pretence to say that he committed the first aggression. That, beyond all question, was on the part of the Marianna Flora; and her firing was persisted in after the Alligator had hoisted her national flag, and, of

course, held out a signal of her real pacific cha-
racter. What, then, is the excuse for this hostile
attack? Was it occasioned by any default or
misconduct on the part of the Alligator? It is
said, that the Alligator had no right to approach
the Marianna Flora, and that the mere fact of
approach authorized the attack. This is what
the Court feels itself bound to deny. Lieutenant
Stockton, with a view to the objects of his cruize,
had just as unquestionable a right to use the
ocean, as the Portuguese ship had; and his right
of approach was just as perfect as her right of
flight. But, in point of fact, Lieutenant Stock-
ton's approach was not from mere motives of
public service, but was occasioned by the acts of
the Marianna Flora. He was steering on a
course which must, in a short time, have carried
him far away from her. She lay to, and showed
a signal ordinarily indicative of distress. It was
so understood, and, from motives of humanity,
the course was changed, in order to afford the
necessary relief. There is not a pretence in the
whole evidence, that the lying to was not volun-
tary, and was not an invitation of some sort.
The whole reasoning on the part of the claim-
ants is, that it was for the purpose of meeting a
supposed enemy by day light, and, in this way, to
avoid the difficulties of an engagement in the
night But how was this to be known on board
of the Alligator? How was it to be known that
she was a Portuguese ship, or that she took the
Alligator for a pirate, or that her object in laying
to was a defensive operation? When the vessels

were within reach of each other, the first salutation from the ship was a shot fired ahead, and, at the same time, no national flag appeared at the mast-head. The ship was armed, appeared full of men, and, from her manœuvres, almost necessarily led to the supposition, that her previous conduct was a decoy, and that she was either a piratical vessel, or, at least, in possession of pirates. Under such circumstances, with hostilities already proclaimed, Lieutenant Stockton was certainly not bound to retreat; and, upon his advance, other guns, loaded with shot, were fired, for the express purpose of destruction. It was, then, a case of open, meditated hos ility, and this, too, without any national flag displayed by the Portuguese ship, which might tend to correct the error, for she never hoisted her flag until the surrender. What, then, was Lieutenant Stockton's duty? In our view it was plain, it was to oppose force to force, to attack and to subdue the vessel thus prosecuting unauthorized warfare upon his schooner and crew. In taking, therefore, the readiest means to accomplish the object, he acted, in our opinion, with entire legal propriety. He was not bound to fly, or to wait until he was crippled. His was not a case of mere remote danger, but of imminent, pressing, and present danger. He had the flag of his country to maintain, and the rights of his cruizer to vindicate. To have hesitated in what his duty to his government called for on such an occasion, would have been to betray (what no honourable

officer could be supposed to indulge) an indifference to its dignity and sovereignty.

But, it is argued, that Lieutenant Stockton was bound to have affirmed his national flag by an appropriate gun; that this is a customary observance at sea, and is universally understood as indispensable to prevent mistakes and misadventures; and that the omission was such a default on his part, as places him *in delicto* as to all the subsequent transactions. This imputation certainly comes with no extraordinary grace from the party by whom it is now asserted. If such an observance be usual and necessary, why was it not complied with on the part of the Marianna Flora? Her commander asserts, that by the laws of his own country, as well as those of France and Spain, this is a known and positive obligation on all armed vessels, which they are not at liberty to disregard. Upon what ground, then, can he claim an exemption from performing it? Upon what ground can he set up as a default in another, that which he has wholly omitted to do on his own part? His own duty was clear, and pointed out; and yet he makes that a matter of complaint against the other side, which was confessedly a primary default in himself. He not only did not hoist or affirm his flag in the first instance, but repeatedly fired at his adversary with hostile intentions, without exhibiting his own national character at all. He left, therefore, according to his own view of the law, his own duty unperformed, and fortified, as against himself, the very inference, that his ship

1826.

The Marianna Flora.

How far the rule or practice of affirming the flag with a gun, is a part of the law of nations.

might properly be deemed, under such circumstances, a piratical cruizer.

But, we are not disposed to admit, that there exists any such universal rule or obligation of an affirming gun, as has been suggested at the bar. It may be the law of the maritime states of the European continent already alluded to, founded in their own usages or positive regulations. But, it does not hence follow, that it is binding upon all other nations. It was admitted, at the argument, that the English practice is otherwise; and, surely, as a maritime power, England deserves to be listened to with as much respect, on such a point, as any other nation. It was justly inferred, that the practice of America is conformable to that of England; and the absence of any counter proof on the record, is almost of itself decisive. Such, however, as the practice is, even among the continental nations of Europe, it is a practice adopted with reference to a state of war, rather than peace. It may be a useful precaution to prevent conflicts between neutrals, and allies, and belligerants, and even between armed ships of the same nation. But the very necessity of the precaution in time of war arises from circumstances, which do not ordinarily occur in time of general peace. Assuming, therefore, that the ceremony might be salutary and proper in periods of war, and suitable to its exigencies, it by no means follows, that it is justly to be insisted on at the peril of costs and damages in peace. In any view, therefore, we do not think this omission can avail the claimants.

Again ; it is argued, that there is a general obligation upon armed ships, in exercising the right of visitation and search, to keep at a distance, out of cannon shot, and to demean themselves in such a manner as not to endanger neutrals. And this objection, it is added, has been specially provided for, and enforced by the stipulations of many of our own treaties with foreign powers. It might be a decisive answer to this argument, that, here, no right of visitation and search was attempted to be exercised. Lieutenant Stockton did not claim to be a belligerent, entitled to search neutrals on the ocean. His commission was for other objects. He did not approach or subdue the Marianna Flora, in order to compel her to submit to his search, but with other motives. He took possession of her, not because she resisted the right of search, but because she attacked him in a hostile manner, without any reasonable cause or provocation.

Doubtless, the obligation of treaties is to be observed with entire good faith, and scrupulous care. But, stipulations in treaties having sole reference to the exercise of the rights of belligerants in time of war, cannot, upon any reasonable principles of construction, be applied to govern cases exclusively of another nature, and belonging to a state of peace. Another consideration, quite sufficient to establish that such stipulations cannot be applied in aid of the present case, is, that whatever may be our duties to other nations, we have no such treaty subsisting with

*1826.*

*The Marianna Flora.*

*How far the conventional law, in respect to the manner of exercising the right of visitation and search, is applicable to this case.*

Portugal. It will scarcely be pretended, that we are bound to Portugal by stipulations to which she is no party, and by which she incurs no correspondent obligation.

Upon the whole, we are of opinion, that the conduct of Lieutenant Stockton, in approaching, and, ultimately, in subduing the Marianna Flora, was entirely justifiable. The first wrong was done by her, and his own subsequent acts were a just defence and vindication of the rights and honour of his country.

*Whether the act of sending in for adjudication subjected the captor to costs and damages.* The next inquiry is, whether the act of sending in the Marianna Flora for adjudication, was, under all the circumstances, unjustifiable, so as to carry with it responsibility in damages.

It is argued, that, upon examination of the ship's papers, the crew, and the cargo, it must clearly have appeared, that the ship was a merchant ship bound on a lawful voyage, and not a piratical cruizer. This state of the case must be admitted to have been apparent. But the real difficulty is of another sort. Her papers, and cargo, and destination, could give no information of the nature of the attack made upon the Alligator. However hostile, malignant, or even piratical, the aggression might be, the papers could shed no light upon the subject. The owners of the cargo, and the owners of the ship, (so far at least as their duties and responsibilities were not bound up by the acts of the master, as their agent,) might be innocent; the voyage might be of a purely mercantile character, and yet, acts of aggression might be committed,

which might bring the case completely within the act of Congress, or of the general law of nations, as a gross and violent injury, calling for ample redress. The real duty imposed upon Lieutenant Stockton was, not to examine the papers, unless so far as they might explain doubtful circumstances, but to ascertain the nature, object, and intent, of the attack upon his vessel. He was bound to exercise an honest and fair discretion on the subject, and to obtain such explanations as might guide his judgment. What was the excuse offered for the attack upon him ? It was not that the guns were fired by mistake or accident. They were admitted to have been by authority and design. They were fired after his own flag was displayed, and with the express intention of disabling the vessel and destroying the crew. The only excuse offered for this unjustifiable act was, that the commander entertained a fear that the Alligator was a pirate. But, such a fear, unauthorized by any acts on the other side, was no excuse for a wrong which might have led to the most fatal consequences. If the Alligator had been seriously injured, or any of her crew had been killed, no doubt could exist, that, under such circumstances, the ship ought to have been sent in for adjudication, to enforce redress, and, also, to administer, if necessary, punishment. The attack was not the less inexcusable because the consequences were not as injurious as the master intended.

It is a different thing to sit in judgment upon this case, after full legal investigations, aided by

the regular evidence of all parties, and to draw conclusions at sea, with very imperfect means of ascertaining facts and principles, which ought to direct the judgment. It would be a harsh judgment to declare, that an officer charged with high and responsible duties on the part of his government, should exercise the discretion intrusted to him at the peril of damages, because a Court of law might ultimately decide, that he might well have exercised that discretion another way. If Lieutenant Stockton had acted with gross negligence or malignity, and with a wanton abuse of power, there might be strong grounds on which to rest this claim of damages. But, it is conceded on all sides, and in this opinion the Court concurs, that he acted with honourable motives, and from a sense of duty to his government. He thought the aggression was piratical, and that it was an indignity to the national flag, utterly inexcusable. The view now taken by this Court, in respect to the whole case, upon a full examination of all the facts, is certainly somewhat different. It leads us to say, that Lieutenant Stockton might, without justly incurring the displeasure of his government, have released the ship, not because she had done no wrong, but because the wrong was not of such a nature as called for vindictive redress.

But, the question upon which damages must depend, is not whether he *might* not have released the ship, but, whether he was, at all events, *bound* so to do; and whether that obligation

was so imperative, that the omission ought to be
visited with damages.

We are, then, to consider the real difficulties
of Lieutenant Stockton's situation.   An attack
had been made upon a national ship under his
command without cause.   It was a hostile act, an
indignity to the nation, and a trespass upon its
rights and sovereignty.   It was not an acciden-
tal, but a meditated act ; not necessarily carrying
own excuse along with it, but susceptible of
different interpretations.   It was not an affair in
which he was at liberty to consult his own wishes
or honour merely, although a brave and distin-
guished officer might naturally feel some solici-
tude to preserve his high reputation untarnished
in the eyes of his government.   He was bound
to look to the rights of his country.   He might
well hesitate in assuming the arbitration of na-
tional wrongs.   He might well feel a scrupulous
delicacy in undertaking to waive any claim which
the government had authority to enforce, or to
defeat any redress which it might choose to seek,
or to prevent any inquiries which, through its
established tribunals, it might think fit to insti-
tute, in respect to his conduct, or that of the of-
fending vessel.   Considerations of this nature
could not but weigh heavily upon the mind of a
gallant officer ; and they are not unfit to be enter-
tained by this Court in forming its own judg-
ment.

It is, also, farther to be observed, that the case
was confessedly new in its character and circum-
stances.   The researches of counsel throughout

1826.

The Marian-
na Flora.
the progress of this protracted controversy, have not discovered any case, which, in point of law, can govern this. If it is new here, it may well be deemed to have been new and embarrassing to Lieutenant Stockton. In such a case, it is not matter of surprise, that he should come to the conclusion that it was not proper to take upon himself the responsibility of a final decision; but to confide the honour of the nation, as well as the rights of the other party, to judicial decision. No inference is attempted to be drawn, that his acts were intentionally oppressive and harsh; and it would be going a great way to declare, that an exercise of honest discretion, in a case of wrong on the other side, ought to draw after it the penalty of damages.

Analogy of da-
mages given
for detention
on captures
jure belli.
There is another more general consideration, which is entitled to great weight in this case. In cases of capture, strictly so called, no decision has been cited, in which, if the capture itself was justifiable, the subsequent detention for adjudication has ever been punished by damages. As far as counsel have examined, or our own researches extend, no such principle has ever been established. The present case stands upon a strong analogy, and to inflict damages would be to desert that analogy. Even in cases of marine torts, independent of prize, Courts of admiralty are in the habit of giving or withholding damages upon enlarged principles of justice and equity, and have not circumscribed themselves within the positive boundaries of mere municipal law. They have exercised a conscientious discretion

upon the subject.   A party, who is *in delicto*, 1826.
ought to make a strong case, to entitle himself to The Marianna Flora.
general relief.

The case of the *Louis*, (2 *Dodson's Rep.* 210.) Case of the Louis, (2 Dodson's Adm. Rep. 210.)
is a striking example in illustration of these re-
marks.    There, a French slave ship was, in a
time of peace, taken possession of by an English
armed cutter, after a sharp engagement, in which
several men were killed on both sides.    The ship
was carried into Sierra Leone for adjudication,
and, subsequently, the cause came before the
High Court of Admiralty upon appeal.    The de-
cision pronounced by Lord Stowell appears to
have been made after very full consideration,
and is expounded in his most elaborate manner.
He decided, that the original seizure was totally
unjustifiable ; and that, even if the slave trade
was prohibited by the French laws, (which, he
thought, it was not,) still, it was not for English
cruizers to claim a right of search, or to seize
such vessels to enforce those laws.    He, there-
fore pronounced a decree of restitution.    But
he denied damages and costs to the claimant. His
language on that occasion was, " Upon the mat-
ter of costs and damages, that have been pray-
ed, I must observe, that it is the first case of the
kind, and that the question itself is *primæ im-
pressionis ;* and that, upon both grounds, it is not
the inclination of the Court to inflict such a cen-
sure."    Here, then, we have a case of an ac-
knowledged maritime trespass, accompanied with
circumstances of immediate and fatal injury, in
which the original wrong travelled along with,

1826.

The Marianna Flora.

and infected the whole subsequent proceedings; and yet the Court, on account of its being the first instance, and of the novelty of the question, deemed it a conscientious exercise of its discretion not to award damages. The case before this Court is also of the first occurrence, and the question is entirely new in its presentation. It has this striking fact, in which it is most favourably distinguished from the *Louis*, that the original seizure was justifiable, and if the intent of piratical aggression had been established, condemnation must have ensued.

If, then, this Court should, under these circumstances, award damages, it would take a new step, never known to have been taken before by a Court of admiralty. It would desert the analogy of cases of justifiable capture in matters of prize, and introduce a rule harsh and severe in a case of first impression, whose bearing and character have engaged the bar and bench in several most laborious discussions, and inflict upon an honest exercise of discretion, a punishment which has been denied, in the *Louis*, to an inexcusable wrong.

Case not exclusively cognizable in the tribunals of Portugal.

There are one or two other suggestions which were urged in the argument, that ought not to be passed over in silence. It is said, that the tort, if it ought to be redressed at all by a proceeding *in rem*, was exclusively cognizable in the Courts of Portugal. We are not aware of any principle upon which this position can be legally maintained. There is no more reason why the Courts of Portugal should hold exclu-

sive jurisdiction upon this case, than the Courts
of this country. We see no difficulty in support-
ing the jurisdiction as concurrent in both nations.
But, if there be any choice, it seems more pro-
perly to belong to the country of the injured,
than of the offending, party.

It is also said, that, at all events, the cargo
was not liable to condemnation, even if the of-
fending vessel was liable under the act of Con-
gress. Probably this is true in respect to that
act. But the second count embraces a wider
range; and if it had been proved in its aggravated
extent, it does not necessarily follow, that the
cargo ought to be exempted. That is a ques-
tion which would require grave deliberation. It
is, in general, true, that the act of the master of
the vessel does not bind the innocent owner of
the cargo; but the rule is not of universal appli-
cation. And where the master is also agent of
the owner of the cargo, or both ship and cargo
belong to the same person, a distinction may,
perhaps, arise, in the principle of decision. But,
however this may be, in the present case, if the
vessel was sent in for adjudication, the cargo
must, of necessity, accompany her; nor could
its particular ownership be fully ascertained,
until the examinations of the crew were regu-
larly taken. There is no evidence in this case
to show, that at any subsequent period it was
desirable, or could have been advantageous to
the claimants, to have separated the ship and

1326.

The Marian-
na Flora.

How far the
act of the mas-
ter binds the
owner of the
vessel.

1826.

The Marian-
na Flora.

Question of
damages for
personal inju-
ries to the cap-
tured crew.
cargo, and to have instituted a new voyage for the latter under other auspices.

In the District Court, an allowance was made of five hundred dollars, distributable among the crew, on account of their confinement on the passage to Boston, upon the ground, that the sending in of the vessel was wrongful. That award was reversed in the Circuit Court; and no appeal was taken by the crew, as, indeed, none could be, on account of the insufficiency of the sum to entitle the parties in interest to appeal. It is only necessary, therefore, to state, that that matter is not now before this Court; and, it is to be presumed, that the confinement was such only as was indispensable for the safety of the seizors.

Upon the whole, it is the opinion of the Court, that the decree of the Circuit Court ought to be affirmed, and it is, accordingly, affirmed, without costs to either party.

<div align="right">Decree accordingly.</div>