KAVANAUGH, Circuit Judge,
dissenting in part:
Plaintiffs are Indonesian citizens who allege that they (or their family members) were imprisoned, beaten, abused, and in some cases killed in Indonesia by Indonesian soldiers. Plaintiffs claim that the Indonesian soldiers violated customary international norms against torture, extrajudicial killing, and prolonged detention. The Indonesian soldiers provided security for an American corporation, Exxon. In this case, plaintiffs did not sue Indonesia or Indonesian officials. Rather, they sued Exxon under the Alien Tort Statute, or ATS, for aiding and abetting the Indonesian officials’ tortious conduct.
The ATS grants federal district courts jurisdiction over “any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States.” 28 U.S.C. § 1350. In *72 cases such as this where no U.S. treaty is involved, the substantive content of an ATS claim is determined by reference to customary international law, also commonly called the law of nations. See Sosa v. Alvarez-Machain, 542 U.S. 692, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004). Customary international law is a kind of international common law. It is a body of sometimes diffícult-to-ascertain rules and principles that arise informally from the general and consistent practice of nations, and that have been recognized and enforced in international tribunals such as the post-World War II tribunal at Nuremberg.
In the District Court, Judge Oberdorfer dismissed plaintiffs’ ATS claims. Doe I v. Exxon Mobil Corp., 393 F.Supp.2d 20, 24-27 (D.D.C.2005). I would affirm Judge Oberdorfer’s decision for any of four independent reasons.[1]
First, under the presumption against extraterritoriality, the ATS does not apply to conduct that occurred in foreign nations— such as this suit, which concerns conduct that occurred in Indonesia. A “longstanding principle of American law” dictates that “legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.” EEOC v. Arabian American Oil Co. (ARAMCO), 499 U.S. 244, 248, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991). The presumption helps the United States avoid conflicts with other nations, which of course have a strong interest in policing and regulating conduct in their own countries. The ATS contains no textual indication that it was meant to apply to conduct in foreign countries. Moreover, the ATS’s historical purpose was to avoid conflicts with foreign governments. It did so by providing redress for foreign citizens who suffered injuries within the United States or on the high seas. As this case exemplifies — given Indonesia’s strenuous and repeated objections to a U.S. court’s entertaining plaintiffs’ suit — extending the ATS to conduct that occurs in foreign countries creates rather than avoids conflicts with foreign nations and thus runs directly counter to both the presumption against extraterritoriality and the ATS’s design and purpose.
Second, as the Second Circuit recently held, the ATS does not apply to claims against corporations. See Kiobel v. Royal Dutch Petroleum Co., 621 F.3d 111 (2d Cir.2010). In Sosa, the Supreme Court stated that courts in ATS cases must determine whether customary international law “extends the scope of liability for a violation of a given norm to the perpetrator being sued.” 542 U.S. at 732 n. 20, 124 S.Ct. 2739. Customary international law does not recognize corporate liability. That means plaintiffs’ ATS claims against a corporation (Exxon) cannot go forward. Moreover, the Supreme Court in Sosa emphasized the need for judicial restraint, *73 “great caution,” and “vigilant doorkeeping” in ATS cases. Id. at 725-29, 124 S.Ct. 2739. Given the Supreme Court’s admonition, it would be quite odd for a U.S. court to allow a customary international law-based ATS claim against a corporation when no international tribunal has allowed a customary international law claim against a corporation.
Third, even if customary international law established corporate liability for torture and extrajudicial killing, we still should not allow plaintiffs’ ATS claims for those violations to go forward because doing so would be incongruous with the Torture Victim Protection Act. The Supreme Court has indicated that courts should exercise judicial restraint and interpret the open-ended language of the ATS by reference to analogous congressionally enacted causes of action. See Sosa, 542 U.S. at 731, 124 S.Ct. 2739. Plaintiffs assert that the ATS and customary international law give aliens a cause of action for torture and extrajudicial killing. The analogous Torture Victim Protection Act gives U.S. citizens a cause of action for torture and extrajudicial killing. But the TVPA does not allow corporate liability or aiding and abetting liability. In exercising the restraint mandated by the Supreme Court in ATS cases, we must follow Congress’s approach to fashioning the TVPA for U.S. citizens and similarly fashion the ATS for aliens. Under the majority opinion’s contrary approach, an alien can sue a corporation in a U.S. court for aiding and abetting torture and extrajudicial killing, but a U.S. citizen cannot sue the same corporation in the same U.S. court for the exact same aiding and abetting of torture and extrajudicial killing. That makes little sense and is, to put it charitably, a strange reading of congressional intent and Supreme Court precedent.
Fourth, the Supreme Court has required us to interpret the open-ended language of the ATS so as to avoid conflict with the Nation’s foreign policy — and therefore, to heed Executive Branch statements of interest in ATS cases. See Sosa, 542 U.S. at 733, 124 S.Ct. 2739 n.21. Following Sosa, courts must dismiss ATS cases when the Executive Branch reasonably explains that the suit would harm U.S. foreign policy interests. Here, the Executive Branch has repeatedly stated that allowing these ATS claims to proceed would harm the United States’ relationship with Indonesia — an assertion backed up by several pointed letters that the Government of Indonesia has submitted directly to this Court and the District Court. The Executive Branch has explained that damage to the United States’ relationship with Indonesia would in turn impair American national security and foreign policy with respect to the ongoing war against al Qaeda, a war in which Indonesia is a key ally. Judge Oberdorfer heeded those concerns and, in light of them, properly dismissed plaintiffs’ ATS claims.[2]
*74 Exercising the caution mandated by the Supreme Court in ATS cases, I would dismiss the ATS claims for any of those four independent reasons. In my judgment, permitting these ATS claims to proceed jumps the rails of proper judicial restraint.
I
First, I would dismiss the ATS claims because the torts alleged here occurred in Indonesia and the ATS does not extend to conduct that occurred in foreign lands.[3]
It is a “longstanding principle of American law ‘that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.’ ” EEOC v. Arabian American Oil Co. (ARAMCO), 499 U.S. 244, 248, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991) (quoting Foley Bros., Inc. v. Filardo, 336 U.S. 281, 285, 69 S.Ct. 575, 93 L.Ed. 680 (1949)). Because Congress “ordinarily legislates with respect to domestic, not foreign matters,” courts presume that statutes do not apply to conduct in foreign lands unless an “affirmative intention of the Congress clearly expressed” indicates otherwise. Morrison v. Nat’l Australia Bank Ltd., — U.S.-, 130 S.Ct. 2869, 2877, 177 L.Ed.2d 535 (2010).
The presumption against extraterritoriality “serves to protect against unintended *75 clashes between our laws and those of other nations which could result in international discord.” ARAMCO, 499 U.S. at 248, 111 S.Ct. 1227. The presumption avoids the “serious risk of interference with a foreign nation’s ability independently to regulate its own commercial affairs.” F. Hoffmamv-La Roche Ltd. v. Empagran S.A., 542 U.S. 155, 165, 124 S.Ct. 2359, 159 L.Ed.2d 226 (2004). “Foreign conduct is generally the domain of foreign law,” and “courts should assume that legislators take account of the legitimate sovereign interests of other nations when they write American laws..” Microsoft Corp. v. AT & T, 550 U.S. 437, 455, 127 S.Ct. 1746, 167 L.Ed.2d 737 (2007) (internal quotation marks and alteration omitted).
The presumption against extraterritoriality is focused on the site of the conduct, not the identity of the defendant. See, e.g., Morrison, 130 S.Ct. at 2884 (the transactions that a statute “seeks to regulate” must occur domestically) (internal quotation marks omitted). That a defendant is a U.S. citizen thus does not mitigate the force of the presumption. In ARAMCO, for example, the Supreme Court held that Title VII did not regulate the foreign employment practices of two Delaware corporations. 499 U.S. at 247, 259, 111 S.Ct. 1227. And in Morrison, the Supreme Court dismissed a securities suit against both foreign and U.S. corporations for misconduct in connection with securities traded on foreign exchanges. 130 S.Ct. at 2875-76, 2888.[4]
That canon of construction is deeply rooted. In 1824, for example, the Supreme Court instructed that “however general and comprehensive the phrases used in our municipal laws may be, they must always be restricted in construction, to places and persons, upon whom the Legislature have authority and jurisdiction.” The Apollon, 22 U.S. 362, 370, 9 *76 Wheat. 362, 6 L.Ed. 111 (1824) (Story, J.); see also Rose v. Himely, 8 U.S. 241, 279, 4 Craneh 241, 2 L.Ed. 608 (1808) (Marshall, C.J.); Murray v. Schooner Charming Betsy, 6 U.S. 64, 118, 2 Craneh 64, 2 L.Ed. 208 (1804) (Marshall, C.J.).
The canon remains to this day an essential part of the Supreme Court’s jurisprudence. The Court has invoked it repeatedly in recent years. See, e.g., Morrison, 130 S.Ct. at 2877 (2010); Small v. United States, 544 U.S. 385, 388, 125 S.Ct. 1752, 161 L.Ed.2d 651 (2005); ARAMCO, 499 U.S. at 248, 111 S.Ct. 1227 (1991).
In applying the presumption against extraterritoriality, we “look to see whether language in the [relevant Act] gives any indication of a congressional purpose to extend its coverage beyond places over which the United States has sovereignty or has some measure of legislative control.” ARAMCO, 499 U.S. at 248, 111 S.Ct. 1227 (alteration in original) (internal quotation marks omitted). “When a statute gives no clear indication of an extraterritorial application, it has none.” Morrison, 130 S.Ct. at 2878.
Here, the sparse text of the ATS does not support application of the law to conduct in foreign lands. The ATS refers to conduct committed in “violation of the law of nations or a treaty of the United States.” To be sure, such conduct can occur worldwide. But as the Supreme Court has explained, the mere fact that statutory language could plausibly apply to extraterritorial conduct does not suffice to overcome the presumption against extraterritoriality. Otherwise, most statutes, including most federal criminal laws, would apply extraterritorially and cover conduct occurring anywhere in the world. In Morrison and ARAMCO, the Supreme Court recognized that commonsense point and ruled that “broad jurisdictional language” and statutory references to acts occurring in “foreign commerce” did not suffice to overcome the presumption against extraterritoriality. See Morrison, 130 S.Ct. at 2882 (interpreting § 10(b) of the Exchange Act); ARAMCO, 499 U.S. at 251, 111 S.Ct. 1227 (interpreting Title VII); see also Small, 544 U.S. at 389-91, 125 S.Ct. 1752 (statutory phrase “convicted in any court” refers only to convictions in domestic courts).
Nor does the ATS’s specific reference to alien plaintiffs establish that the statute applies extraterritorially. That language merely ensures that alien plaintiffs can sue under customary international law for injuries suffered within the United States. Similarly, in ARAMCO, the statute covered aliens, but the Supreme Court said the statute did not apply to extraterritorial conduct. See 499 U.S. at 255, 111 S.Ct. 1227 (Title VII did not apply abroad although the statute protected aliens working in the United States).
The ATS’s historical context likewise provides no basis for rebutting the presumption against extraterritoriality. Indeed, the ATS’s background provides affirmative evidence reinforcing the conclusion that the statute does not apply to conduct occurring in foreign countries.
Under the Articles of Confederation, which were in effect from 1781 until the U.S. Constitution was ratified in 1788, the U.S. Government lacked authority to remedy or prevent violations of the law of nations. Two incidents during that period involving foreigners mistreated in the United States highlighted the problem created by this legal vacuum. In the “Marbois Affair” of 1784, the Secretary of the French Legion, a French ambassador of sorts, was assaulted on a street in Philadelphia. See William R. Casto, The Federal Courts’ Protective Jurisdiction Over Torts Committed in Violation of the Law of Nations, 18 Conn. L.Rev. 467, 491-92 *77 (1986). And in 1787, a New York City-constable entered the home of a Dutch ambassador and arrested one of the ambassador’s servants, violating the ambassador’s diplomatic privileges. See id. at 494. Both torts violated a customary international law norm — namely, infringements on the rights of ambassadors. Yet Congress was powerless to ensure redress for either violation of the law of nations. The impotence of the national government in turn generated conflict with foreign nations concerned that their citizens could not obtain legal redress for certain injuries suffered in the United States. See, e.g., Sosa v. Alvarez-Machain, 542 U.S. 692, 717 n. 11, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004).
After ratification of the Constitution in 1788, the First Congress addressed this problem in 1789 by enacting the Alien Tort Statute, which was part of Section 9 of the Judiciary Act of 1789. See id. at 717, 124 S.Ct. 2739. The statutory text allowed aliens to sue for torts committed in violation of the law of nations or a U.S. treaty. The ATS’s primary purpose was to ensure federal redress for incidents like the two described above and thereby avoid unnecessary conflicts with foreign nations. See id. at 715-20, 124 S.Ct. 2739. The First Congress was concerned about aliens who were injured in the United States in violation of customary international law, but who had no redress in federal court. But there is no evidence that Congress was concerned about remedying aliens’ injuries that occurred in foreign lands. And there is no particular reason that Congress would have been concerned about aliens injured in foreign lands. Remedies for such injuries could be provided, after all, by foreign sovereigns under their countries’ laws.[5] It would be very odd to think that the Congress of 1789 wanted to create a federal tort cause of action enforceable in U.S. court for, say, a Frenchman injured in London.
The purpose and background of the ATS — avoiding conflict with foreign nations — thus reinforce the presumption against extraterritoriality. And modern ATS litigation further demonstrates the continuing vitality of the concerns that undergird the presumption. The goal of the presumption against extraterritoriality, like the goal of the ATS, is to avoid conflict with foreign nations. But recent ATS cases based on acts that occurred in foreign nations have often engendered conflict with other sovereign nations, rather than avoided it. The Government of Indonesia, for example, has strenuously and repeatedly objected to this lawsuit. The Government of South Africa complained for six years that an extraterritorial ATS case litigated in the Second Circuit interfered with the operation of its post-apartheid Truth and Reconciliation Commission. See Sosa, 542 U.S. at 733 n. 21, 124 S.Ct. 2739. The Canadian government objected to an ATS suit brought against a Canadian corporation for conduct that occurred in Sudan, explaining that the suit interfered with Canada’s foreign relations. See Presbyterian Church of Sudan v. Talisman Energy, Inc., No. 01-9882, 2005 WL 2082846, at *1-2 (S.D.N.Y. Aug. 30, 2005). The Government of Papua New Guinea objected for at least two years to an ATS suit against a mining corporation that operated on the island, complaining that the *78 litigation had “potentially very serious social, economic, legal, political and security implications” for Papua New Guinea and would impair its relations with the United States. See Sarei v. Rio Tinto, 487 F.3d 1193, 1199 (9th Cir.2007), rev’d on unrelated grounds en banc, 550 F.3d 822 (2008). And several other nations — including the United Kingdom, Switzerland, and Germany — have complained that the ATS improperly interferes with their rights to regulate their citizens and conduct in their own territory. See Developments in the Law: Extraterritoriality, 124 Harv. L.Rev. 1226,1283 (2011).[6]
This laundry list shows that something is palpably awry in the modern ATS litigation juggernaut. The problem stems in large part from extension of the ATS to conduct occurring in foreign lands. The presumption against extraterritoriality was designed, in part, to prevent such overreaching and thereby avoid this kind of international discord. See ARAMCO, 499 U.S. at 248, 111 S.Ct. 1227. As its history reveals, the ATS shared the same broad purpose. Stretching the ATS to cover conduct in other countries thus has managed to flout the purposes of both the ATS itself and the longstanding presumption against extraterritoriality. Courts may— and indeed, under binding Supreme Court precedent, must — adhere to and apply the settled presumption against extraterritoriality, and thereby avoid creating this kind of unnecessary international discord.[7]
To be sure, the interaction of the ATS and the presumption against extraterritoriality does raise one analytical wrinkle, although it’s not presented in this case: Does the ATS apply to conduct on the high seas — that is, conduct neither in the territory of the United States nor in the territory of a foreign country? I believe the better answer is yes, and that the presumption against extraterritoriality is overcome to that limited extent in ATS cases. The Supreme Court noted in Sosa that piracy was one of the three causes of action contemplated by the First Congress when it passed the ATS. 542 U.S. at 720, 124 S.Ct. 2739. “[Pjiracy, by the law of nations, is robbery upon the sea”; it cannot, as a definitional matter, occur on U.S. soil. United States v. Smith, 18 U.S. 153, 162, 5 Wheat. 153, 5 L.Ed. 57 (1820) (Story, J.). (The other two causes of action originally available under the ATS — offenses against ambassadors and violations of safe conducts — can occur in the United States.) Because we know that Congress intended the ATS to cover piracy and because piracy occurs on the high seas, it follows that Congress intended the ATS to apply to conduct on the high seas.
Applying the ATS to conduct on the high seas does not pose the risk of conflicts with foreign nations that the presumption against extraterritoriality and the ATS itself were primarily designed to avoid. The high seas are jurisdictionally unique. They are “the common highway of all nations,” governed by no single sovereign. The Apollon, 22 U.S. at 371. As a result, the high seas may fall within the jurisdiction of the federal courts even *79 when foreign countries and foreign territorial waters do not. See, e.g., American Banana Co. v. United Fruit Co., 213 U.S. 347, 355-56, 29 S.Ct. 511, 53 L.Ed. 826 (1909) (“No doubt in regions subject to no sovereign, like the high seas, or to no law that civilized countries would recognize as adequate, such countries may treat some relations between their citizens as governed by their own law, and keep, to some extent, the old notion of personal sovereignty alive. They go further, at times, and declare that they will punish anyone, subject or not, who shall do certain things, if they can catch him, as in the case of pirates on the high seas.”) (internal citations omitted); The Apollon, 22 U.S. at 371 (distinguishing “foreign ports and territories” from “places where our jurisdiction is complete, ... our own waters, or ... the ocean”); Breach of Neutrality, 1 U.S. Op. Att’y Gen. 57, 58 (1795) (crimes committed in foreign country “are not within the cognizance of our courts,” but “crimes committed on the high seas are within the jurisdiction of the district and circuit courts of the United States”).
That distinction between foreign lands and the high seas makes good sense, particularly as applied to the ATS. Tortious conduct that occurs in a foreign nation’s territory is regulated by the foreign sovereign. Tortious conduct on the high seas, by contrast, is regulated by no nation in particular. See Smith, 18 U.S. at 162 (describing “the general practice of all nations in punishing all persons, whether natives or foreigners, who have committed [piracy] against any persons whatsoever, with whom they are in amity”). Although the United States risks offending foreign nations by regulating conduct occurring in those foreign countries, it performs something of an international public service by supplying a customary international law cause of action in federal court against illegal conduct on the high seas. Cf. The Marianna Flora, 24 U.S. 1, 40, 11 Wheat. 1, 6 L.Ed. 405 (1825) (pirates “are, in truth, the common enemies of all mankind”) (Story, J.). The ATS, designed to smooth and improve the United States’ relations with foreign nations, thus quite sensibly may be interpreted to extend to conduct on the high seas but not to conduct in foreign countries.[8]
*80 Early cases mentioning the ATS, though few in number, confirm that the statute applies to conduct in the United States or on the high seas, but not to conduct in foreign nations. In the decade after the ATS’s passage, the two reported cases that discussed the statute dealt with conduct that occurred in the United States or on the high seas. See Bolchos v. Darrel, 3 F.Cas. 810 (No. 1,607) (D.S.C.1795) (ATS provides jurisdiction when wrongful seizure occurred at U.S. port and “original cause arose at sea”); Moxon v. The Fanny, 17 F.Cas. 942, 948 (No. 9,895) (D.Pa. 1793) (owners of British ship sought damages for its seizure in U.S. waters by a French privateer; ATS does not apply because suit was not “for a tort only”).
Attorney General Bradford’s 1795 opinion about an incident in Sierra Leone also supports this distinction between (i) conduct in the United States or on the high seas and (ii) conduct in foreign lands. The Bradford opinion considered whether the United States could criminally prosecute an individual for acts committed on the high seas and in Sierra Leone. The opinion also mentioned civil liability under the ATS. The opinion is best read to say that the ATS applies to conduct in the United States or on the high seas. It does not say that the ATS extends to conduct in foreign lands. Because the opinion’s meaning has been the subject of some debate in ATS cases, compare Maj. Op. at 23-24, with Kiobel v. Royal Dutch Petroleum Co., 621 F.3d 111, 142 n. 44 (2d Cir.2010), I reproduce the relevant portion in its entirety here:
So far, therefore, as the transactions complained of originated or took place in a foreign country, they are not within the cognizance of our courts; nor can the actors be legally prosecuted or punished for them by the United States. But crimes committed on the high seas are within the jurisdiction of the district and circuit courts of the United States; and, so far as the offence was committed thereon, I am inclined to think that it may be legally prosecuted in either of those courts, in any district wherein the offenders may be found. But some doubt rests on this point, in consequence of the terms in which the ‘Act in addition to the act for the punishment of certain crimes against the United States’ [the Neutrality Act of 1794] is expressed. But there can be no doubt that the company or individuals who have been injured by these acts of hostility have a remedy by a civil [ATS] suit in the courts of the United States; jurisdiction being expressly given to these courts in all cases where an alien sues for a tort only, in violation of the laws of nations, or a treaty of the United States; and as such a suit may be maintained by evidence taken at a distance, on a commission issued for that purpose, the difficulty of obtaining redress would not be so great as in a criminal prosecution, where viva voce testimony alone can be received as legal proof.
1 U.S. Op. Att’y Gen. at 58-59 (first and second emphases added). When the Bradford opinion finally mentions the ATS, it is focused on acts “committed on the high seas,” not on acts that occurred in a foreign country. The Second Circuit recently analyzed the Bradford opinion and reached the same conclusion: “Attorney General Bradford circumscribes his opinion, appearing to conclude that the Company *81 could not bring suit for the actions taken by the Americans in a foreign country, but rather, could sue only for the actions taken by the Americans on the high seas.” Kiobel, 621 F.3d at 142 n. 44 (internal quotation marks omitted). To the extent an opinion of one Attorney General matters to judicial interpretation of the ATS, the Bradford opinion supports the view that the ATS applies to conduct in U.S. territory and on the high seas, but it does not support the conclusion that the ATS extends to conduct in foreign countries.
In sum, the presumption against extraterritoriality bars ATS suits based on conduct in foreign lands. The ATS contains no “indication of a congressional purpose to extend its coverage” to conduct occurring in foreign lands. ARAMCO, 499 U.S. at 248, 111 S.Ct. 1227. And the ATS’s history provides affirmative evidence supporting its limited geographic scope. The First Congress was, for good reason, primarily concerned about torts against aliens that occurred within the United States and on the high seas. Extending the ATS to conduct that occurs in foreign countries not only violates the presumption against extraterritoriality, but runs counter to the ATS’s broad purpose of avoiding conflict with foreign nations. Applying the bedrock presumption against extraterritoriality would alleviate the serious discord with foreign nations that has arisen in recent years as courts have extended the ATS to conduct occurring in foreign lands. I would dismiss plaintiffs’ ATS claims— which are based on conduct that occurred in Indonesia — because the ATS does not apply to conduct that occurred within a foreign country.
II
Second, and in the alternative, I would dismiss plaintiffs’ ATS claims because the ATS does not apply to claims against corporations. In cases such as this where no U.S. treaty is involved, claims under the ATS are defined and limited by customary international law, and customary international law does not extend liability to corporations.
The ATS allows alien plaintiffs to bring tort claims for violations of customary international law norms that are “accepted by the civilized world and defined with a specificity comparable to” the three original norms thought to be cognizable under the ATS: offenses against ambassadors, violations of safe conducts, and piracy. Sosa v. Alvarez-Machain, 542 U.S. 692, 725, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004). As the Supreme Court directed: “Whatever the ultimate criteria for accepting a cause of action subject to jurisdiction” under the ATS, “federal courts should not recognize private claims under federal common law for violations of any international law norm with less definite content and acceptance among civilized nations than the historical paradigms [offenses against ambassadors, violations of safe conducts, and piracy] familiar when [the ATS] was enacted.” Id. at 732, 124 S.Ct. 2739. The Court emphasized that courts must exercise “great caution” and “vigilant doorkeeping” in ATS eases. Id. at 728-29, 124 S.Ct. 2739.
The Supreme Court has said that we look to customary international law not only for the substantive content of the tort but also for the categories of defendants who may be sued. Id. at 732 n. 20, 124 S.Ct. 2739. This is done “on a norm-specific basis.” Ali Shaft v. Palestinian Authority, 642 F.3d 1088, 1096 (D.C.Cir. 2011); see also Tel-Oren v. Libyan Arab Republic, 726 F.2d 774, 791-95 (D.C.Cir. 1984) (Edwards, J., concurring).
In particular, the Court in Sosa stated that customary international law determines whether only state actors may be *82 liable for violating a customary international law norm (as was the traditional approach), or whether private actors such as corporations or private individuals also may be liable for violating a given norm. As the Court explained, whether an ATS claim can be brought against a corporation or a private individual depends on “whether international law extends the scope of liability for a violation of a given norm to the perpetrator being sued, if the defendant is a private actor such as a corporation or individual.” 542 U.S. at 732 n. 20, 124 S.Ct. 2739 (emphasis added). Later in the opinion, the Court underscored that customary international law defines who can be sued; the Court said that the plaintiff in Sosa needed to show that the defendant “was acting on behalf of a government” when he allegedly violated a norm, for otherwise the plaintiff “would need a rule broader still ” to establish ATS liability. Id. at 737, 124 S.Ct. 2739 (emphasis added). Like footnote 20, that later sentence in Sosa indicated quite clearly that customary international law answers the question of who may be sued in ATS cases. Justice Breyer reiterated the same point in his Sosa concurrence: To qualify for recognition under the ATS, a norm of international law “must extend liability to the type of perpetrator (e.g., a private actor) the plaintiff seeks to sue.” Id. at 760, 124 S.Ct. 2739 (Breyer, J., concurring).
The Supreme Court has thus required that we look to customary international law to determine what categories of defendants can be liable for violating a particular norm. See Kiobel v. Royal Dutch Petroleum, 621 F.3d 111, 127-28 (2d Cir. 2010). As applied to this case, Sosa requires us to determine “whether international law extends the scope of liability” for aiding and abetting torture, extrajudicial killing, and prolonged detention “to the perpetrator being sued”—here, a corporation. Sosa, 542 U.S. at 732 n. 20, 124 S.Ct. 2739.
To support an ATS claim against a corporation, it would not be sufficient to show that customary international law prohibits torture, extrajudicial killing, and prolonged detention when committed by state actors. It likewise would not be sufficient to show that customary international law recognizes corporate liability for some violations, but not for aiding and abetting torture, extrajudicial killing, and prolonged detention. Rather, for plaintiffs to maintain their claims, customary international law must impose liability against corporations for aiding and abetting torture, extrajudicial killing, or prolonged detention.[9] *83 It does not. In fact, customary international law does not impose liability against corporations at all.
Customary international law generally extends liability to states, as well as to individuals who act under color of state law or aid and abet states. For most customary international law norms, customary international law does not extend liability to individuals who act independently of state involvement. (Piracy is a prominent exception; customary international law imposes liability on private individuals for piracy.) Most importantly for present purposes, customary international law does not extend liability to corporations. As the Second Circuit accurately stated, “[t]he concept of corporate liability for violations of customary international law has not achieved universal recognition or acceptance as a norm in the relations of States with each other.” Kiobel, 621 F.3d at 149; see also id. at 186 (Leval, J., concurring) (“It is true that international law, of its own force, imposes no liabilities on corporations or other private juridical entities.”).
A brief review of customary international law convincingly demonstrates that, as the Second Circuit concluded, there is no corporate liability in customary international law, much less corporate liability for violations of the norms alleged here.
Traditionally, legal rights and duties under international law applied primarily to sovereign states. See 1 Restatement (Third) of the Foreign Relations Law of the United States § 101 (1987) (Reporters’ Notes). The Nuremberg trials following World War II “for the first time made explicit and unambiguous” that “individuals are responsible” for the commission of international crimes. Robert H. Jackson, Final Report to the President Concerning
the Nürnberg War Crimes Trial, reprinted in 20 Temp. L.Q. 338, 342 (1946). No corporations were charged or convicted in the Nuremberg trials, however, even though many corporate executives were individually tried. See Jonathan A. Bush, The Prehistory of Corporations and Conspiracy in International Criminal Law: What Nuremberg Really Said, 109 Colum. L.Rev. 1094, 1098 (2009). Although numerous executives of the German company I.G. Farben were charged at the U.S. military tribunal, the Tribunal stated that “the corporate defendant, Farben, is not before the bar of this Tribunal and cannot be subjected to criminal penalties in these proceedings” because “corporations act through individuals.” 8 Trials of War Criminals Before the Nuernberg Military Tribunals Under Control Council Law No. 10 1153 (1952). Indeed, the London Charter, which established the International Military Tribunal at Nuremberg, provided jurisdiction for the tribunal to “try and punish” only “individuals or ... members of organizations.” Agreement for the Prosecution and Punishment of the Major War Criminals of the European Axis art. 6, Aug. 8, 1945, 59 Stat. 1544, 82 U.N.T.S. 280; see also id. art. 9-10 (Tribunal may declare that “the group or organization of which the individual was a member was a criminal organization,” which designation may serve as proof in a subsequent trial of an individual “for membership therein.”).
Every international tribunal since Nuremberg that has enforced customary international law has followed this path, extending liability to individuals but not to corporations. To take the most prominent examples, the International Criminal Tribunals for Rwanda and the former Yugo *84 slavia have jurisdiction only over “natural persons.” See Kiobel, 621 F.3d at 136.
A recent U.N. Report noted the “absence of an international accountability mechanism” for corporate conduct. Report of the Special Representative of the Secretary-General on the Issue of Human Rights and Transnational Corporations and Other Business Enterprises ¶ 21, U.N. Doc. A/HRC/4/35 (Feb. 19, 2007). The U.N. Report concluded that “States have been unwilling to adopt binding international human rights standards for corporations.” Id. ¶ 44. As a result, “[b]efore the current round of cases in U.S. courts, no corporation had ever been charged with or convicted for an international war crime or similar offense.” Bush, Prehistory of Corporations at 1098.
The Second Circuit recently summarized the state of the law this way:
Looking to international law, we find a jurisprudence, first set forth in Nuremberg and repeated by every international tribunal of which we are aware, that offenses against the law of nations (i.e., customary international law) for violations of human rights can be charged against States and against individual men and women but not against juridical persons such as corporations. As a result, although customary international law has sometimes extended the scope of liability for a violation of a given norm to individuals, it has never extended the scope of liability to a corporation.
Kiobel, 621 F.3d at 120.
In short, the content of an ATS claim is governed by customary international law, and customary international law does not provide liability against corporations for torture, extrajudicial killing, or prolonged detention (or aiding and abetting thereof). Even assuming that there were hints in customary international law of corporate liability for certain customary international law violations, it surely cannot be said that corporate liability for the norms alleged in this case has been established with the specificity and widespread acceptance required by Sosa for ATS cases.[10]
Plaintiffs agree that customary international law does not extend liability to certain categories of defendants. Plaintiffs acknowledge, for example, that customary international law, except with respect to certain norms such as piracy, does not impose liability on private individuals who act independently of state involvement. And plaintiffs recognize that when customary international law does not extend liability to private individual defendants for violations of a given norm, U.S. courts cannot allow ATS suits against private individual defendants for violations of that customary international law norm.
Despite acknowledging that we should follow customary international law in determining when private parties may be *85 liable in ATS cases for violations of a given norm, plaintiffs say we should not follow customary international law in determining whether one particular category of private parties — corporations—may be liable in ATS cases. Rather, plaintiffs say that, notwithstanding the clear limits of customary international law, we should feel free to fashion a broader federal common-law rule allowing liability against corporations in ATS cases.
Plaintiffs’ position frankly makes little sense. Either customary international law determines which categories of defendants may be liable under the ATS, or it does not. In Sosa, the Supreme Court resolved that question. The Court stated that customary international law does in fact determine which categories of defendants may be liable in ATS cases on a norm-by-norm basis. See 542 U.S. at 732 n. 20, 737, 124 S.Ct. 2739. Our Court has said the same. See Ali Shaft, 642 F.3d at 1095-96; Tel-Oren, 726 F.2d at 791-95 (Edwards, J., concurring). Applying that principle here should not be complicated — other than for the inconvenient fact that it does not lead to plaintiffs’ desired result with respect to corporate liability.
The approach of plaintiffs and the majority opinion produces a very odd result: A defendant who would not be liable in an international tribunal for violation of a particular customary international law norm nonetheless may be liable in a U.S. court in an ATS suit for violation of that customary international law norm. In light of Sosa’s direction, I agree with the Second Circuit that such a result is simply “inconceivable.” Kiobel, 621 F.3d at 122.
In sum, customary international law does not provide corporate liability for aiding and abetting torture, extrajudicial killing, or prolonged detention. Therefore, plaintiffs cannot maintain their ATS claims against Exxon, a corporation.
Ill
Third, and also in the alternative, even if customary international law established corporate liability for aiding and abetting torture and extrajudicial killing, we still should not allow plaintiffs’ ATS claims for those violations to go forward because doing so would be incongruous with the Torture Victim Protection Act, 28 U.S.C. § 1350 note.[11]
In 1992, Congress passed and President Bush signed the Torture Victim Protection Act. That Act supplies a civil cause of action to American citizens, as well as aliens, for torture and extrajudicial killing. Americans can sue under the TVPA, just as aliens can sue under the ATS. But the TVPA does not provide for corporate liability, and it does not provide for aiding and abetting liability. As I will explain, because the TVPA does not provide for corporate liability or aiding and abetting liability in suits by U.S. citizens, we should interpret the ATS likewise not to provide for corporate liability or aiding and abetting liability in analogous suits by aliens.[12]
Why should we pay attention to the limits in the TVPA’s causes of action for *86 torture and extrajudicial killing when fashioning the contours of ATS causes of action for torture and extrajudicial killing? Recall that customary international law is notoriously vague and somewhat ill-defined. There is no book or code that tells us the content of customary international law; indeed, it is often unclear who is even making customary international law. Modern customary international law thus sometimes has a make-it-up-as-you-go-along feel to it. See Curtis A. Bradley & Jack L. Goldsmith, Customary International Law as Federal Common Law: A Critique of the Modem Position, 110 Harv. L.Rev. 815, 839-41 (1997) (describing the numerous sources and rapidly changing content of customary international law). Indeed, even back at the Constitutional Convention, Gouverneur Morris noted that international law principles were “often too vague and deficient to be a rule” without implementing legislation by the Congress. 2 The Records of the Federal Convention of 1787, at 615 (Max Farrand ed., rev. ed.1937). That reality poses difficulty for U.S. courts trying to figure out the content of customary international law for purposes of an ATS suit. And that difficulty in turn poses a risk that courts will be left with little more than their own policy preferences when determining the scope of an ATS/customary international law claim.
All of this is good reason for judicial restraint in ATS cases. Indeed, in Sosa, the Supreme Court emphasized the paramount need for judicial restraint, “great caution,” and “vigilant doorkeeping” in ATS cases, and the Court outlined several principles of restraint that must guide the Judiciary. See Sosa v. Alvarez-Machain, 542 U.S. 692, 725-33, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004). For example, as discussed above in Part II of this opinion, the Court insisted that the Judiciary recognize only those customary international law norms that are sufficiently definite and widely accepted.
Relevant to the present discussion, the Court also emphasized that courts should “look for legislative guidance before exercising innovative authority over substantive law” in ATS cases. Id. at 726, 124 S.Ct. 2739. The Court pointed out that Congress by direct or indirect command may scale back customary international law norms otherwise cognizable in ATS cases. See id. at 731, 124 S.Ct. 2739 (Congress may “shut the door to the law of nations” either “explicitly, or implicitly by treaties or statutes that occupy the field”); see also id. at 760, 124 S.Ct. 2739 (Breyer, J., concurring) (“Congress can make clear that courts should not recognize any such norm, through a direct or indirect command or by occupying the field”).
What this means is that plaintiffs in ATS cases must pass through two filters with respect to the substance of their claims. First, they must show that their alleged claim against the defendant is firmly grounded in customary international law. Second, they also must show that Congress has not cast doubt on their asserted ATS claim by direct or indirect command.
In my view, Sosa’s emphasis on judicial restraint and on the role of Congress dictates the following interpretive principle in ATS cases: When Congress has enacted a statute that gives U.S. citizens a cause of action for tortious conduct that is also a violation of customary international law, then the statutory limits on U.S. citizens’ recovery under that statute should presumptively apply to aliens’ recovery under the ATS as well. That interpretive principle avoids the bizarre result that would ensue if aliens — but not U.S. citizens— could bring suit in U.S. court for the same injuries caused by the same defendants.
*87 Applying this Sosa-based interpretive principle, corporations should not be liable in ATS cases based on alleged torture or extrajudicial killing. The Torture Victim Protection Act authorizes “a civil action for recovery of damages from an individual who engages in torture or extrajudicial killing” and who acts “under actual or apparent authority, or color of law, of any foreign nation.” Pub.L. No. 102-256, 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350, note) (emphasis added). As this Court recently held, the TVPA’s text and structure establish that corporations are not proper defendants in TVPA suits. Mohamad v. Rajoub, 634 F.3d 604, 607-08 (D.C.Cir.2011); see also Bowoto v. Chevron Corp., 621 F.3d 1116 (9th Cir.2010). The word “individual” in the TVPA carries “its ordinary meaning,” which “encompasses only natural persons and not corporations or other organizations.” Mohamad, 634 F.3d at 607; see also 1 U.S.C. § 1 (Dictionary Act) (the word “person” includes “corporations, companies, associations, firms, partnerships, societies, ... as well as individuals ”) (emphasis added).
Under the Sosa-based interpretive principle, plaintiffs’ ATS claims for torture and extrajudicial killing are barred not just because the TVPA provides no corporate liability, but also because the TVPA provides no aiding and abetting liability. Plaintiffs are suing Exxon under an aiding and abetting theory. But the text of the TVPA does not provide for aiding and abetting liability, and the Supreme Court has made crystal clear that there can be no civil aiding and abetting liability unless Congress expressly provides for it. See Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994). Because liability for aiding and abetting torture and extrajudicial killing does not exist under the TVPA, courts should not allow liability for aiding and abetting torture and extrajudicial killing under the ATS.
To be clear, the TVPA does not alter or affect the contours of ATS suits based on customary international law norms other than torture and extrajudicial killing. See Sosa, 542 U.S. at 728, 124 S.Ct. 2739. The TVPA was not intended to generally preempt or displace all ATS suits. See id. (TVPA’s “legislative history includes the remark that [the ATS] should ‘remain intact to permit suits based on other norms that already exist or may ripen in the future into rules of customary international law ”) (quoting H.R.Rep. No. 102-367, pt. 1, p. 4, 1992 U.S.C.C.A.N. 84, 86 (1991)). But the TVPA does reflect a specific congressional decision about when and under what circumstances U.S. citizens (and aliens) may sue for torture and extrajudicial killing. It would be odd and incongruous to disregard those limits in defining when aliens may sue for torture and extrajudicial killing under the ATS. Put simply, Sosa told courts in ATS cases to look to Congress for guidance, and Congress has specifically delineated what limits should attach to civil suits for torture and extrajudicial killing. Consistent with that direction in Sosa, we should follow the TVPA when fashioning the contours of the famously vague ATS. And it makes eminent sense to fashion the ATS so that aliens cannot recover in U.S. court for torture and extrajudicial killing in circumstances where U.S. citizens could not recover in U.S. court for torture and extrajudicial killing.[13]
*88 The majority opinion discounts the relevance of the TVPA to our analysis here. By doing so, however, the majority opinion produces the rather bizarre outcome that aliens may sue corporations in U.S. courts for aiding and abetting torture and extrajudicial killing, but U.S. citizens may not sue U.S. corporations for aiding and abetting torture and extrajudicial killing. In my view, it is implausible to think that Congress intended such a discrepancy. And it is inconsistent with Sosa to enshrine such a discrepancy into ATS case law. Because the TVPA does not provide corporate liability or aiding and abetting liability for torture and extrajudicial killing, the ATS likewise does not provide corporate liability or aiding and abetting liability for torture and extrajudicial killing.[14]
IV
Fourth, and again in the alternative, I would affirm the District Court’s dismissal of plaintiffs’ ATS claims because the Executive Branch has reasonably explained that adjudicating those ATS claims would harm U.S. foreign policy interests.
In Sosa, as noted above, the Supreme Court emphasized that lower courts must exercise judicial restraint in ATS cases. Part of that restraint, the Court said, is “a policy of case-specific deference to the political branches” that applies in cases touching on the foreign relations of the United States. Sosa v. Alvarez-Machain, 542 U.S. 692, 733 n. 21, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004). In “such cases,” the Court instructed, “there is a strong argument that federal courts should give serious weight to the Executive Branch’s view of the case’s impact on foreign policy.” Id.; see also id. at 760-61, 124 S.Ct. 2739 (Breyer, J., concurring) (“courts should give ‘serious weight’ to the Executive Branch’s view of the impact on foreign policy that permitting an ATS suit will likely have in a given case or type of case”). The Court added that courts considering ATS cases should be “particularly wary of impinging on the discretion of the Legislative and Executive Branches in managing foreign affairs.” Id. at 727, 124 S.Ct. 2739.
The judicial restraint dictated by Sosa footnote 21 means the following: When the Executive Branch reasonably explains that adjudication of a particular lawsuit would adversely affect U.S. foreign policy interests, the court should dismiss the lawsuit. See id. at 733 n. 21, 124 S.Ct. 2739; cf. Republic of Austria v. Altmann, 541 U.S. 677, 702, 124 S.Ct. 2240, 159 L.Ed.2d 1 (2004) (“[S]hould the State Department *89 choose to express its opinion on the implications of exercising jurisdiction over particular petitioners in connection with their alleged conduct, that opinion might well be entitled to deference as the considered judgment of the Executive on a particular question of foreign policy.”); Crosby v. Nat’l Foreign Trade Council, 530 U.S. 363, 386, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000) (regarding state legislation regulating foreign commerce with Burma: “[Rjepeated representations by the Executive Branch supported by formal diplomatic protests and concrete disputes are more than sufficient to demonstrate that the state Act stands in the way of Congress’s diplomatic objectives.”); Hwang Geum Joo v. Japan, 413 F.3d 45, 52 (D.C.Cir.2005) (“The Executive’s judgment that adjudication by a domestic court would be inimical to the foreign policy interests of the United States is compelling and renders this case nonjusticiable under the political question doctrine.”).
The theory behind Sosa footnote 21 is straightforward. Congress created a tort cause of action for aliens based on customary international law, a kind of international common law. Congress did so in order to benefit America’s foreign relations. But if an ATS suit would harm the Nation’s foreign relations — as assessed and explained by the Department of State or Department of Justice as representative of the President of the United States — then the courts have no business ignoring that statement of interest, thereby threatening the Nation’s foreign relations and thwarting Congress’s intent in the ATS.
Plaintiffs’ case against Exxon has been pending for a decade, and the Executive Branch has repeatedly expressed its views on the ATS claims. The Executive has reasonably and consistently stated that adjudication of plaintiffs’ ATS claims would harm U.S. foreign policy interests.
In July 2002, the State Department filed a statement of interest with the District Court stating that this case would interfere with the U.S. Government’s foreign policy goals. That letter explained:
[Tjhe Department of State believes that adjudication of this lawsuit at this time would in fact risk a potentially serious adverse impact on significant interests of the United States, including interests related directly to the on-going struggle against international terrorism. It may also diminish our ability to work with the Government of Indonesia (“GOI”) on a variety of important programs, including efforts to promote human rights in Indonesia.
With respect to this litigation, it is the Department’s considered opinion that adjudication at this time could adversely affect United States interests in two ways, recognizing that such effects cannot be determined with certainty. First, the GOI may respond to the litigation by curtailing cooperation with the United States on issues of substantial importance to the United States. Second, the litigation’s potential effects on Indonesia’s economy could in turn adversely affect important United States interests.
Letter from William H. Taft, IV, Legal Adviser, Department of State, to The Honorable Louis F. Oberdorfer, United States District Court for the District of Columbia 1-2 (July 29, 2002) (footnote omitted).
In 2003, the Department of Justice submitted a “Supplemental Statement of Interest” addressing some of the legal issues raised by plaintiffs’ claims. That statement explained that the U.S. Government’s concerns about the litigation required that the District Court dismiss the ATS claims:
It remains the United States’ position that adjudication of this case would raise *90 foreign policy and national security concerns for the reasons articulated in the State Department’s letter. Those concerns can be avoided by holding, as the United States contends, that the ATS does not create an independent right of action.
Supplemental Statement of Interest of the United States of America at 2, Doe I v. Exxon Mobil Corp., 393 F.Supp.2d 20 (D.D.C.2005).
In the District Court, Judge Oberdorfer paid careful attention to the Executive Branch’s stated concerns and dismissed plaintiffs’ ATS claims, in part to avoid “adjudicating the actions of the Indonesian government.” Doe I v. Exxon Mobil Corp., 393 F.Supp.2d 20, 26-27 (D.D.C. 2005). Exxon then asked this Court to entertain an interlocutory appeal or grant a writ of mandamus compelling the District Court to dismiss plaintiffs’ D.C. tort claims as well. This Court declined to do so. See Doe v. Exxon Mobil Corp., 473 F.3d 345 (D.C.Cir.2007). The Court’s opinion focused on plaintiffs’ D.C. tort claims — the only issue presented — and did not evaluate either the Executive Branch’s statement of interest with respect to the ATS claims or the District Court’s decision to dismiss the ATS claims.
Exxon petitioned for certiorari with respect to the D.C. tort claims, and the Government filed an amicus brief urging the Supreme Court to deny the writ. Brief for the United States as Amicus Curiae at 8-9, Exxon Mobil Corp. v. Doe, 554 U.S. 909 (2008) (No. 07-81). In so doing, the Government’s brief — which was signed by the Solicitor General and the Legal Adviser to the Department of State — reiterated the U.S. Government’s position on the ATS claims:
• The District Court “reach[ed] the result the United States had advocated with respect to respondents’ ATS claims” when it dismissed those claims. Id. at 8.
• “Moreover, the United States had said that its ‘concerns can be avoided by holding * * * that the ATS does not create an independent right of action,’ and the district court responded by granting petitioners’ motion to dismiss the ATS and TVPA claims, which were premised on alleged violations of international law by the Indonesian government.” Id. at 16 (quoting Supplemental Statement of Interest of the United States of America at 2, Doe I v. Exxon Mobil Corp., 393 F.Supp.2d 20, 2003 WL 25625348).
• “[A]s a result of the district court’s rulings narrowing the scope of respondents’ suit, the case now presents neither of the particular situations discussed in Sosa and Altmann. In Sosa, the Court addressed the deference owed to the Executive Branch by the courts in exercising their federal-common-law-making authority under the ATS with respect to claims alleging violations of international law. Here, the district court dismissed respondents’ claims under the ATS, as the United States had requested, as well as those under the TVPA.” Id. at 17-18 (internal citation omitted).
The U.S. Government’s amicus brief to the Supreme Court thus plainly stated that the Executive Branch opposed the ATS claims and that the District Court correctly dismissed plaintiffs’ ATS claims in light . of the Executive Branch’s concerns. That amicus brief was the Executive Branch’s ■ last statement on this lawsuit.
In sum, in 2002, 2003, and 2008, the Executive ■ Branch reasonably explained that the court would harm U.S. foreign policy interests if it allowed plaintiffs’ ATS claims to proceed. The Executive Branch has never retracted the statements. *91 Judge Oberdorfer followed Sosa’s instruction to give “serious weight to the Executive Branch’s view of the case’s impact on foreign policy,” and he dismissed the ATS claims. 542 U.S. at 733 n. 21, 124 S.Ct. 2739. In light of Sosa footnote 21, I would affirm Judge Oberdorfer’s decision.
The majority opinion disagrees. In my judgment, the majority opinion does not give proper weight to the Executive Branch statements about the ATS claims. To be sure, it is possible that the Supreme Court didn’t mean what it said in Sosa footnote 21. And it is possible that the Executive Branch no longer believes what it said in 2002, 2003, and 2008. On the current record, however, there can be little doubt under Sosa footnote 21 that the Executive Branch’s clear and consistent statements require dismissal of the ATS claims. On remand, the District Court still can (and in my view, should) invite the Executive Branch to state or clarify its views once again. If the Executive Branch reiterates its objection to the ATS claims, then the District Court should dismiss those claims.
I respectfully dissent.

. In addition to their ATS claims, plaintiffs have asserted claims under the federal Torture Victim Protection Act and state tort law. I agree with the majority opinion’s decision to affirm dismissal of the TVPA claims. I also agree with the majority opinion's decision to remand the state-law claims, including for a careful analysis of whether those claims are preempted under the foreign affairs preemption doctrine. See American Ins. Ass’n v. Garamendi, 539 U.S. 396, 422-23, 123 S.Ct. 2374, 156 L.Ed.2d 376 (2003); Zschemig v. Milter, 389 U.S. 429, 88 S.Ct. 664, 19 L.Ed.2d 683 (1968); Hines v. Davidowitz, 312 U.S. 52, 61 S.Ct. 399, 85 L.Ed. 581 (1941); Saleh v. Titan Corp., 580 F.3d 1, 11-12 & 12 n. 8 (D.C.Cir.2009); see also Chamber of Commerce of the United States v. Whiting,-U.S. -, 131 S.Ct. 1968, 1983, 179 L.Ed.2d 1031 (2011) (describing "uniquely federal areas of regulation” and citing Garamendi and Crosby v. NatT Foreign Trade Council, 530 U.S. 363, 373-74, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000), as examples of federal authority over foreign affairs).

. Plaintiffs base their claims on underlying customary international law norms against torture, extrajudicial killing, and prolonged detention. From a lower court’s perspective in an ATS case, there may be as many as seven currently cognizable customary international law norms: what one might call the "Blackstone three” plus the “Breyer four.” The original Blackstone three are offenses against ambassadors, violations of safe conducts, and piracy. Sosa, 542 U.S. at 715, 124 S.Ct. 2739. The Breyer four — which Justice Breyer identified but the Court as a whole has not yet taken a position on — are torture, genocide, crimes against humanity, and war crimes. Id. at 762, 124 S.Ct. 2739 (Breyer, J., concurring). Because plaintiffs assert a torture claim — which is one of the Breyer four and at this point almost certainly has become a customary international law norm cognizable in ATS cases against state actors at least— plaintiffs' suit satisfies that threshold requirement for an ATS claim. Cf. id. at 738, 124 S.Ct. 2739 (dismissing suit because no cogni *74 zable customary international law norm alleged). For that reason, unlike in Sosa, we must consider the various other arguments raised by Exxon against plaintiffs’ ATS claim for torture. It seems doubtful, however, that the other two norms asserted by plaintiffs— extrajudicial killing and prolonged detention, which are not among the Blackstone three or the Breyer four — would be cognizable in an ATS suit against any defendant. Because the majority opinion is remanding the ATS suit to the District Court, it will be up to that court on remand to assess whether the ATS extends to claims for extrajudicial killing and prolonged detention.

. Somewhat surprisingly, no court of appeals has analyzed whether the ATS applies to conduct that took place in a foreign nation. In its recent opinion on ATS corporate liability, the Second Circuit expressly left this question open and suggested that it "very well could conclude that the ATS does not apply extra-territorially, and thus we would dismiss this and the vast majority of recent ATS suits on the ground that the violations of customary international law alleged by plaintiffs originated or took place in a foreign country.” Kiobel v. Royal Dutch Petroleum Co., 621 F.3d 111, 143 n. 44 (2d Cir.2010) (internal quotation marks omitted); see also id. at 117 n. 10. One Ninth Circuit judge who has addressed the issue stated that the ATS should not apply to conduct that occurred on foreign land. See Sarei v. Rio Tinto, PLC, 625 F.3d 561, 563-64 (9th Cir.2010) (Kleinfeld, J., dissenting). In Sosa, the extraterritoriality issue was raised, but the Court did not reach it because the Court rejected the ATS claim on other grounds. Only Justice Breyer alluded to the extraterritoriality issue, and he did so only briefly. See Sosa v. Alvarez-Machain, 542 U.S. 692, 761-63, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004) (Breyer, J., concurring).
It is true that some courts of appeals, without any analysis of extraterritoriality, have permitted ATS suits even though the underlying tortious conduct occurred in foreign countries. See, e.g., Hilao v. Estate of Marcos, 25 F.3d 1467 (9th Cir.1994); Filartiga v. Pena-Irala, 630 F.2d 876 (2d Cir.1980). We are of course not bound by decisions of other courts of appeals. Moreover, those cases contain no judicial analysis of the extraterritoriality question and thus provide no persuasive arguments for accepting the extraterritorial application of the ATS. See Arizona Christian School Tuition Organization v. Winn, - U.S. -■, 131 S.Ct. 1436, 1448-49, 179 L.Ed.2d 523 (2011) (conclusion assumed sub silentio in prior cases is not precedent). And the fact that some of those cases have been on the books for several years does not add materially to their persuasive force. See Milner v. Dep’t of the Navy, - U.S.-, 131 S.Ct. 1259, 1268, 179 L.Ed.2d 268 (2011) ("immaterial” that an incorrect doctrine "has been consistently relied upon and followed for 30 years” in the lower courts).

. The majority opinion cites Steele v. Bulova Watch Co., 344 U.S. 280, 73 S.Ct. 252, 97 L.Ed, 319 (1952), and Pasquantino v. United States, 544 U.S. 349, 125 S.Ct. 1766, 161 L.Ed.2d 619 (2005), in claiming that "the calculus can change where a U.S. citizen is a cause of the harm.” Maj. Op. at 27. But the Supreme Court discussed both of those cases in ARAMCO and Morrison, and the Supreme Court's analysis does not support the majority opinion's use of those cases here. The Supreme Court determined that the presumption against extraterritoriality applied the same way in all four cases, and the defendant’s citizenship did not affect the extraterritoriality analysis. ARAMCO and Morrison make crystal clear that the American identity of the defendant does not defeat the presumption against extraterritoriality. In Steele, moreover, the statute under consideration applied to "all commerce which may lawfully be regulated by Congress,” and that "express[] state[ment]” in the statutory text rebutted the presumption against extraterritoriality regardless of the identity of the defendant. See Morrison, 130 S.Ct. at 2886 n. 11; ARAMCO, 499 U.S. at 252-53, 111 S.Ct. 1227. In Pasquantino, the conduct at issue occurred entirely within the United States, and the Supreme Court therefore did not need to give the statute any extraterritorial effect — again, focusing on the defendant’s conduct, not his citizenship. See Morrison, 130 S.Ct. at 2887; Pasquantino, 544 U.S. at 371, 125 S.Ct. 1766.
The Supreme Court has also ruled that the presumption against extraterritoriality bars a suit based on foreign conduct even when a U.S. citizen defendant took some actions in the United States related to the foreign conduct. In ARAMCO, for example, the Title VII defendant — who . allegedly discriminated against an employee working in Saudi Arabia — originally hired that employee in Houston. 499 U.S. at 247, 111 S.Ct. 1227. And in Morrison, the allegedly deceptive conduct— which affected securities transactions abroad — occurred in Florida. 130 S.Ct. at 2883-84. As the Morrison Court explained, "it is a rare case of prohibited extraterritorial application that lacks all contact with the territory of the United States. But the presumption against extraterritorial application would be a craven watchdog indeed if it retreated to its kennel whenever some domestic activity is involved in the case.” Id. at 2884.

. To be clear, the point here is not that plaintiffs must exhaust their remedies in foreign nations' legal systems — here, Indonesia's — before bringing claims under the ATS. Contra Maj. Op. at 26-27. Rather, the point here is that a foreign sovereign can decide whether and how to redress an injury that occurs within its territory. And that traditional understanding of sovereignty explains why Congress in 1789 would not choose to extend this U.S. tort law to conduct occurring in foreign lands.

. That is not to say that foreign governments always have laudable motives when objecting. But that's not the relevant issue. The ATS and the presumption against extraterritoriality were designed to avoid conflict with foreign nations, and modern ATS litigation has thwarted that purpose.

. To the extent an individual commits an offense abroad and then flees to the United States as a fugitive from the foreign nation's legal process, the traditional international relations tool to address that situation is extradition. At this point, of course, the United States has extradition treaties with most other nations of the world. See 18 U.S.C. §§ 3181— 3196.

. The central point here is that piracy typically occurs on the high seas, not in a nation's territory. Moreover, extending a cause of action to conduct on the high seas poses no risk of conflict with foreign nations. It follows that applying the ATS to conduct on the high seas is consistent with the goals of the ATS and the presumption against extraterritoriality. The majority opinion says that persons could aid or instigate piracy from foreign land or commit piracy in foreign territorial waters. See Maj. Op. at 21, 22-23 n. 7, 25 & n. 10. The majority opinion reasons that the ATS thus must extend to conduct on foreign land. In my view, such a theoretical possibility is far too thin a reed to overcome the presumption against extraterritoriality and extend the ATS to conduct on foreign land. "Characteristically [piracy] has been regarded as an of-fence of the open seas,” not in a nation's territory. Edwin D. Dickinson, Is the Crime of Piracy Obsolete?, 38 Harv. L.Rev. 334, 336-37 (1925); see, e.g., U.S. Const, art. I, § 8 ("Congress shall have Power ... To define and punish Piracies and Felonies committed on the high Seas, and Offenses against the Law of Nations”); 4 William Blackstone, Commentaries *72 ("The offence of piracy, by common law, consists in committing those acts of robbery and depredation upon the high seas, which, if committed upon land, would have amounted to felony there.”); Sosa, 542 U.S. at 719, 124 S.Ct. 2739 ("Consider, too, that the First Congress was attentive enough to the law of nations to recognize certain offenses expressly as criminal, including the three mentioned by Blackstone. See An Act for the Punishment of Certain Crimes Against the United States, § 8, 1 Stat. 113-114 (murder or robbery, or other capital crimes, punishable as piracy if committed on the high seas)....") (emphasis added); id. at 749, 124 S.Ct. 2739 (Scalia, J., concurring) ("That portion of the general common law known as the *80 law of nations was understood to refer to the accepted practices of nations in their dealings with one another (treatment of ambassadors, immunity of foreign sovereigns from suit, etc.) and with actors on the high seas hostile to all nations and beyond all their territorial jurisdictions (pirates).") (emphasis added).

. Because customary international law governs this issue, foreign nations' domestic laws are not relevant here, contrary to a suggestion in the majority opinion. See Maj. Op. at 53-55. ''[T]he fact that a legal norm is found in most or even all 'civilized nations' does not make that norm a part of customary international law.” Kiobel, 621 F.3d at 118. "[Tjhat corporate criminal liability has recently obtained greater acceptance in Europe' — although interesting as a matter of comparative law — does not demonstrate that corporate liability has attained the status of a norm of customary international law." Id., at 141 n. 43 (citing Filartiga v. Pena-Irala, 630 F.2d 876, 888 (2d Cir.1980), for the proposition that customary international law consists of norms that are “of mutual, and not merely several, concern”) (internal citations omitted). The Supreme Court itself underscored this point in Sosa, holding that a claim for arbitrary detention was not cognizable under the ATS even though the alleged detention was illegal under Mexican law. Sosa, 542 U.S. at 736-37, 124 S.Ct. 2739; see also id. at 737 n. 28, 124 S.Ct. 2739 ("Sosa might well have been liable under Mexican law”). In any event, there is no consensus in foreign nations' legal systems that corporations can be liable for violations of the kind alleged here. See Report of the Special Representative of the Secretary-General on the Issue of Human Rights and Transnational Corporations and Other Business Enterprises ¶ 34, U.N. Doc. *83 A/HRC/4/35 (Feb. 19, 2007) ("At national levels, there is enormous diversity in the scope and content of corporate legal responsibilities regarding human rights.”).

. Although it does not explain the relevance of this point to its analysis or conclusion in this case, the majority opinion says in passing that the "law of nations” referred to in the ATS is distinct from customary international law. See Maj. Op. at 36-37 n. 23. But courts and leading scholars equate the two terms. See, e.g., Curtis A. Bradley, State Action and Corporate Human Rights Liability, 85 Notre Dame L.Rev. 1823, 1824 (2010) ("For a variety of reasons, the alleged international law viola-lion in ATS cases is almost always a violation of the 'law of nations,’ also known today as ‘customary international law,’ rather than a violation of a treaty.”); William A. Fletcher, Congressional Power Over the Jurisdiction of Federal Courts: The Meaning of the Word “All” in Article III, 59 Duke L.J. 929, 944 (2010) ("The law of nations was what we today call customary international law.”). The substance and relevance of footnote 23 of the majority opinion are thus somewhat unclear.

. The majority opinion asserts that Exxon forfeited this claim. See Maj. Op. at 56 n. 45. But Exxon devoted a page in the text of its brief to arguing that ”[i]t would be wholly improper for courts to create a federal common-law cause of action under the ATS broader than the directly analogous action established by Congress,” the TVPA. Exxon Br. at 31-32. I address that argument here.

. As an alternative to their aiding and abetting claim, plaintiffs have also asserted that Exxon acted under color of Indonesian law and was, in effect, a state actor. However, plaintiffs have failed to argue that Exxon acted under color of law as defined by customary international law.

. The TVPA was not redundant with the ATS for at least three reasons. First, the TVPA gives a cause of action to U.S. citizens and aliens, not just to aliens. Second, the TVPA supplies a cause of action for extrajudicial killing, which is likely not a cognizable cus *88 tomary international law violation in ATS cases because it is not one of the Blackstone three or the Breyer four. See supra note 2. Third, at the time the TVPA was enacted in 1992, it was unclear whether any causes of action could be asserted under the ATS without further congressional action. See, e.g., Tel-Oren v. Libyan Arab Republic, 726 F.2d 774 (D.C.Cir.1984) (disagreement between Judges Edwards and Bork on this issue). The TVPA eliminated some uncertainty by definitively establishing causes of action for torture and extrajudicial killing.

. The TVPA provides a cause of action for torture and extrajudicial killing. The analysis in this section thus precludes plaintiffs' ATS claims based on those two asserted customary international law norms. Plaintiffs also claim a third alleged customary international law norm — prolonged detention. The TVPA does not speak to prolonged detention or put limits on it. But that alleged norm is not one of the Blackstone three or the Breyer four, and thus is not likely a customary international law norm cognizable in ATS cases. The prolonged detention claim thus likely fails at the threshold, as did the asserted arbitrary detention norm in Sosa itself. See supra note 2. In any event, the prolonged detention claim fails for any of the other three alternative reasons set forth in Parts I, II, and IV of this opinion.